# ETHEL THOMPSON v. WABASH RAILROAD COMPANY, Appellant.

### Division One, December 2, 1914.

1. **INTERSTATE COMMERCE: Empty Cars.** The hauling by an interstate railroad of a train of empty freight cars from a point in one State to a point in another State, is interstate commerce. The fact that the cars are empty does not make the shipment any the less interstate than it would be were they loaded either with articles of commerce or passengers.

2. ———: ———: **Proper Plaintiff: Widow of Killed Foreman: Under U. S. Employers' Liability Act.** The right of a widow of a fireman for a train of empty cars being hauled by an interstate railroad from a point in one State to a point in another State, to recover for his negligent death, caused by a collision of his train with another, is dependent on the Act of Congress of April 22, 1908, known as the Federal Employers' Liability Act. Where said act is invoked and the shipment and road are interstate, the plaintiff's right to recover is regulated thereby, and not by the State Damage Act (Sec. 5425, R. S. 1909).

Appeal from Randolph Circuit Court.—*Hon. A. H. Waller,* Judge.

Thompson v. Railroad.

REVERSED AND REMANDED (*with directions*).

*J. L. Minnis* and *Robertson & Robertson* for appellant.

(1) The petition does not state a cause of action and the court erred in overruling defendant's objection to the introduction of any evidence thereunder. The petition disclosed that defendant was engaged in interstate commerce and decedent employed in such commerce, therefore the only cause of action that could have arisen was by virtue of the Federal Employers Liability Act and there could be no action maintained under Sec. 5425, R. S. 1909. Railroad v. Vreeland, 227 U. S. 66; Second Employers Liability Cases, 223 U. S. 54; Railroad v. Alabama, 128 U. S. 99; Railroad v. Hefley, 158 U. S. 104; Henderson v. New York, 92 U. S. 271; Gaslight Co. v. Light Co., 115 U. S. 661; Morgan's Co. v. Board of Health, 118 U. S. 464; State v. Railroad, 238 Mo. 21; Railroad v. Birch, 224 U. S. 547; State v. Railroad, 212 Mo. 658; Rich v. Railroad, 166 Mo. App. 389; Thornton on Federal Employers' Liability and Safety Appliance Acts (2 Ed.), sec. 160, see also Appendix "A" to "H," pp. 397 et seq.; McCulloch v. Maryland, 4 Wheat. 415; Adams Express Co. v. Croninger, 33 U. S. Sup. Ct. Rep. 148; Railroad v. Ellis, 153 S. W. 701; Railroad v. Lester, 149 S. W. 841. (2) The court erred in refusing to instruct a verdict for defendant at the close of the evidence for the plaintiff and at the close of all the evidence. Because the evidence showed defendant was engaged in interstate commerce and decedent was employed in such commerce at the time of his death.

*M. J. Lilly* and *Phillips & Phillips* for respondent.

(1) The petition states a cause of action under Sec. 5425, R. S. 1909, and not under the Federal Em-

ployers' Liability Act as contended by appellant. It appears from the petition that plaintiff's husband while in the employ of the defendant came to his death by the negligence of co-employees, and that he died from an injury occasioned by the negligence of certain servants of defendant whilst running, conducting and managing a locomotive and train of cars, which would bring plaintiff within the provisions of section 5425; but it does not appear that either deceased or his co-employees, by whose negligence he was killed, were engaged in interstate commerce at the time, which would be necessary in order to create a liability against defendant under the Federal Employers' Liability Act. The petition contains an allegation to the effect that the train, on which deceased was serving as a locomotive fireman at the time of the collision which resulted in his death, was being operated from Moulton, Iowa, to Moberly, Missouri, but there is no allegation that it was laden with goods, wares or merchandise or that it was carrying passengers, being transported from one State to the other, and the evidence shows that the train was composed entirely of empty cars. A train composed of empty cars destined from a point in one State to a point in another State to procure a load is not engaged in interstate commerce. Railroad v. Virginia, 93 Va. 749; 7 Cyc. 417; 34 L. R. A. 105. Commerce among the several States includes the transportation of passengers and property from one State to another. Smith v. Turner, 7 How. (U. S.) 401; Addyston Pipe Co. v. U. S., 175 U. S. 241; Ferry Co. v. Pennsylvania, 114 U. S. 203; In re Grand Jury (U. S.), 62 Fed. 828. The facts of this case differentiate it from the case of Rich v. Railroad, 166 Mo. App. 379, to which appellant refers as a case in point, and what is said there has no application here. The rule announced in Rich v. Railroad, supra, is "a car laden with goods and being moved from a point in one state to a point in another is impressed with the character

of interstate traffic which will follow and attend the shipment until the transit ceases." With the rule thus announced respondent finds no fault; but in the case at bar where the cars composing the train were empty it has no application. In this case nothing was being transported—no passengers, no property; only that which might be made an instrument of commerce—a train of empty cars, was being moved. (2) The case was properly submitted to the jury by appropriate instructions which correctly declared the law as applied to the facts of the case developed by the testimony. The evidence established a cause of action in favor of plaintiff and against defendant under Sec. 5425, R. S. 1909, and does not show that her husband for whose death damages are asked was engaged in interstate commerce at the time of the injury resulting in his death.

WOODSON, P. J.—The plaintiff instituted this suit in the circuit court of Randolph county, against the defendant, to recover $10,000 damages, claimed to have been sustained by her by reason of the alleged negligence of the defendant in killing her husband, R. W. Thompson, a railroad fireman, while in the employ of the company. The suit was brought under section 5425, Revised Statutes 1909.

A trial was had in the circuit court which resulted in a judgment in favor of the plaintiff for the sum of $10,000. In due time and in proper form the defendant appealed the cause to this court. The petition was in conventional form and properly stated a case under said section of the statute.

Prior to answering, and in proper time and due form, the defendant filed a petition and bond for a removal of the cause to the circuit court of the United States, for the Northern Division of the Eastern District of Missouri.

The petition set out that the action arose under the act of Congress approved April 22, 1908, entitled, "An

Act relating to the liability of common carriers by railroad to their employees in certain cases;'' that it appeared from plaintiff's petition that the defendant was engaged in, and decedent was employed in, interstate commerce at the time of his death (stating the averments of plaintiff's petition); that the question in the suit was whether plaintiff was entitled to recover under the act of Congress approved April 22, 1908, and that the suit involved a controversy with respect to the true meaning and intent of the act of Congress and its operation and effect upon the alleged facts of plaintiff's petition. This petition was overruled and exceptions were duly saved. .

Defendant's amended answer, filed March 14, 1911, upon which it went to trial, was a general denial; also it set out that defendant was engaged in commerce between the States and that decedent at the time of his death was employed in such commerce; that plaintiff was not the administratrix or personal representative of decedent and the action was not brought by her in such capacity, as provided by the act of Congress of April 22, 1908, and the plaintiff was not entitled to maintain the action as the widow of decedent. Further that the State circuit court had no jurisdiction, but that the jurisdiction was in the United States circuit court.

The answer then alleged that the collision was the result of decedent's own negligence and further as the result of his own negligence directly contributing with others with whom he was engaged in operating the train.

The answer also set up the unconstitutionality of the act of Congress approved April 5, 1910, conferring jurisdiction on State courts, as in conflict with section 1 of article 3 of the Constitution of the United States and certain amendments thereto, as well as certain provisions of the Constitution of the State of Missouri.

The reply was a general denial.

At the beginning of the trial the defendant objected to the introduction of any evidence under the petition for the reason that it did not state facts sufficient to constitute a cause of action against the defendant; that the plaintiff could not maintain the action because it arose under the "Federal Railroad Employers' Liability Act of April 22, 1908;" and that the court had no jurisdiction of the cause.

This objection was overruled and exceptions were duly saved.

The facts are few and not disputed; and are substantially as stated by counsel for respondent:

Respondent's husband, R. W. Thompson, while in the employ of appellant as a locomotive fireman on an extra freight train, was killed in a collision between said freight train and one of defendant's passenger trains, on defendant's line of railroad, at a point about one and one-half miles south of Glenwood, Missouri, on the 28th day of August, 1909. Within six months thereafter, plaintiff, the widow of deceased, brought this action against defendant to recover damages for the death of her said husband, under the provisions of section 5425, Revised Statutes 1909, it being claimed by plaintiff that her husband came to his death by reason of the negligence of certain of his co-employees, namely, the engineer and conductor in charge of said freight train, in operating same in so negligent a manner as to cause it to run into and against and to collide with said passenger train.

The defendant was operating a railroad for the transportation of freight and passengers from Moberly, in the State of Missouri, to Moulton and other points in the State of Iowa.

The extra freight train on which plaintiff's said husband was serving as fireman was in charge of Finis McLeen as engineer and Warren Cundiff as conductor. There were also a head and rear brakeman on the train. It left Moulton, Iowa, for Moberly, Missouri, about.

8:45 the morning of the collision and made but one stop thereafter prior to the collision; that stop being made at Glenwood Junction, a station about one mile north of Glenwood, Missouri. It left Glenwood Junction at 9:30 and passed through Glenwood without a stop. The collision occurred at 9:39. The passenger train with which the extra freight collided, ran daily, except Sunday, between Moberly and points in Iowa, and was run on schedule time and had superior rights to all extras. It was due at Glenwood at 9:43, and at Glenwood Junction at 9:45. The passenger train was being run by a time-card and the freight train by order. The order under which the engineer and conductor were operating the freight train was to this effect: Extra 259 will run extra Moulton to Moberly. No. 2, engine 327, will wait at east yards Moulton until 10 a. m. for 2nd 95, engine 261. 2nd 95, engine 261, will wait at Glenwood Junction until 9:30 a. m. and at Coatesville until 9:40 a. m. for extra, engine 259. The stop made by the freight train at Glenwood Junction was for the purpose of letting 2nd 95 by. The extra freight train was composed of engine, tender and empty cars.

The collision occurred on the point of a sharp curve, and at that place the passenger train with which the freight collided could not have been seen from the cab of the freight engine a greater distance away than one hundred yards. The passenger train was discovered by the engineer of the freight train as soon as it could have been discovered. It was then within ten car-lengths of the freight train. The two trains came together in what is known as a "head-on" collision.

The engineer of the extra freight train accounts for the collision by the fact that both he and the conductor, who had charge of the train, overlooked the day of the week; that is to say, mistook Saturday for Sunday. The engineer received a go-ahead signal from the brakeman and conductor at Glenwood Junc-

tion, he whistled for the station at Glenwood and again received a go-ahead signal, and, using the engineer's language, "got the board at the station," or in other words, the arm of the order board at Glenwood was down, giving the engineer the right to go ahead.

The deceased fireman, R. W. Thompson, at the time of his death had been in the employ of the defendant as a locomotive fireman six or seven months, the greater part of which time he served as an extra fireman, and as such his duties took him all over the Western Division of the Wabash Railroad which has a mileage of about nine hundred and fifty miles. The last two or three months prior to his death he served as fireman with Engineer McLean on trains 67 and 68, which were regular trains between Moberly and Moulton. The trains on which he served met the passenger train with which extra 259 collided many times in the course of that two or three months' employment, but not always nor even usually at any one station. In fact, as disclosed by the record of trains on which Fireman Thompson served in the course of the last two or three months of his employment, he had met the passenger train in question at practically every station on the Wabash Railroad between Moberly and Moulton.

On the day of the fatal collision, Engineer McLean and Conductor Cundiff had control and were in charge of the extra freight. The duty of Fireman Thompson was to keep steam on the engine and to watch for signals and to aid in the safety of the train to the extent of his ability.

Thompson remained upon the engine at his post of duty and did not protest to the engineer when the freight train was being run on the time of the passenger train, as shown by the time-card. The engineer testified that while going through Coatesville, which is north of Glenwood Junction, he stated to the fireman and head brakeman that it was Sunday and that if he

could get out of Glenwood Junction at 9:30, he would try to go to Moberly ahead of No. 2 which was the passenger train following. The engineer says that neither the fireman nor head brakeman made any reply to this statement. The head brakeman testified that the engineer turned to him and the fireman and asked if it was Sunday, and that he, the head brakeman, turned to him and said this isn't Sunday, and that the fireman said no.

At that time the freight train was going through Coatesville, had not reached Glenwood Junction and was not running on the time of the passenger train. The principal duty of the fireman was to keep fire in the firebox and to keep up steam. This required him to be down in the deck of the engine shoveling coal a great part of the time. When the freight train pulled out of Glenwood Junction, its last stop before the collision, it was only 9:30 and the next station was Glenwood about one mile away. At that time the passenger train lacked sixteen minutes of being due at Glenwood. Not until Glenwood was passed did the freight train begin to run on the time of the passenger train. The collision occurred about a mile and a half out of Glenwood. Not more than two or three minutes, at the outside, elapsed after the freight train crossed the danger line at Glenwood. For only two or three minutes at the most could Fireman Thompson have known that the freight train was running on the time of the passenger train, and he had only two or three minutes for protest even if he had realized and known the whole situation as it then existed.

Some of the facts will be made clear by setting out a few extracts from defendant's evidence.

The Engineer McLean testified:

That it was the duty of the fireman to keep up steam, watch for signals, to aid in the safety of the train to the extent of his ability, and whenever he discovered anything wrong he should tell it. That the

fireman was under the instructions of the engineer, but had nothing to do with managing the engine. That the brakemen were under the control and supervision of the conductor. Witness and fireman got an order that morning to run extra 259 from Moulton, Iowa, to Moberly. Thompson read the order. He was a man of good intelligence and a good fireman. The order meant that extra 259 was to keep out of the way of regular trains. No. 51 was controlled by a regular time-table. This time-table was identified by the witness as Time-Table No. 10. Witness kept one of those time-tables over his seat box in the engine cab where he could look at it. Witness was well acquainted with the running time of No. 51, learning it from the time-card. That morning he looked at the time-card at Moulton and saw the time of No. 51 at Glenwood. That morning when witness left Moulton he had it in his head it was Sunday. Coming through Coatesville he told the fireman Thompson, the decedent, and the head brakeman it was Sunday and that they would try to get out of Glenwood Junction at 9:30. Neither the decedent nor the head brakeman replied. Witness announced it was Sunday and he was going on. Neither decedent nor head brakeman told the witness it was not Sunday. His train lay at Glenwood Junction eight minutes to let 2nd 95 by. No. 2 was following witness's train, forty-five minutes late. Witness received orders that 2nd No. 95, a freight, would wait until 9:30 at Glenwood for Extra 259 to pass. Witness was trying to beat No. 2 to Moberly. No. 2 was a superior passenger train. Passing Glenwood station, witness saw people on the platform of the station, indicating they were there to take a train. The decedent could see these people plainer than witness. No. 2 was not due regularly in Glenwood until 10:12 and that day was forty-five minutes late. Witness passed through Glenwood thirteen minutes before No. 51 was due and forty minutes ahead of the regular time of No. 2, and one hour

and twenty-eight minutes ahead of No. 2's time that day.

It was the duty of the fireman to look out for the safety of the train. Thompson had been making this run for three months and meeting No. 51. Extra 259 consisted of ten cars, going from Moulton, in the State of Iowa, to Moberly, Missouri. No. 51 was a passenger train with three cars and running from Moberly, Missouri, to Ottumwa, Iowa.

Firemen get their time-cards as engineers; get them at the round houses by asking for them. Witness identified book of rules of defendant, marked Exhibit 2.

There was other evidence corroborative of that of the engineer.

I. There are but two legal propositions of importance presented by this appeal, viz.:

First: Was the deceased, R. W. Thompson, at the time he met his death, engaged in interstate commerce? and, second: Was he at that time guilty of such contributory negligence that directly contributed to his injury?

Before the plaintiff can recover both of these questions must be answered in the negative, while the affirmance of either would lead to a reversal of the judgment and a denial of her right to a recovery in this particular case.

For convenience we will answer these questions in the order in which they are stated.

Attending the first: It is practically conceded, or rather the evidence for both parties shows, that the Wabash Railroad Company was duly organized and incorporated under the laws of the State of ——, and was engaged in the business of transporting both freight and passengers over its road, one branch of which leads from Moberly, Missouri, to Moulton, and other points in the State of Iowa, by means of locomo-

tive engines and cars managed by crews composed of engineers, firemen, conductors, brakemen, porters, etc.

The deceased, the late husband of the plaintiff, had been engaged as a fireman on one of the company's engines hauling freight in cars, between said points over said road, for some six or seven months. Counsel for each party concede that this general work in which the deceased was engaged was interstate commerce, but counsel for the plaintiff insist that at the particular time at which the deceased met his death, he was not so engaged, for the reason assigned, that the train of cars which the engine in which he was firing was drawing, were empty cars, containing neither freight nor passengers, and therefore he was not engaged in interstate commerce. In other words, it is insisted that interstate commerce consists of carrying or transporting either freight or passengers or both, from one State to another by various instrumentalities, and that since this particular train was carrying neither, it could not be logically contended that he was engaged in interstate commerce.

In support of this general contention we are cited by counsel for appellant to the following cases: Passenger Cases, 7 How. (U. S.) 1. c. 401; Addyston Pipe & Steel Co. v. United States, 175 U. S. 1. c. 241; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 1. c. 203; In re Charge to Grand Jury (U. S.), 62 Fed. 828, 1. c. 831.

And in support of the particular question in hand, we are by counsel for respondent cited to the case of Norfolk Ry. Co. v. Commonwealth of Virginia, 93 Va. 749. That case clearly supports the contention of counsel. In that case the Supreme Court of Virginia held that a train consisting of empty freight cars, which had been used exclusively to transport coal from one State to another and which was intended to be so used again, was not, while being returned from one point in that State to another State, engaged in the transpor-

tation of articles of interstate commerce, although *en route* to the coal fields outside of that State.

While that is a highly respectable court, yet we, under the more recent ruling of the Supreme Court of the United States, the final arbiter in all such cases, are unable to lend our concurrence to the view of the law as there announced.

In construing the act of Congress mentioned, the Supreme Court of the United States, in the case of Michigan Central Railroad Company v. Vreeland et al., 227 U. S. l. c. 66, said:

"We may not piece out this Act of Congress by resorting to the local statute of the State of procedure or that of the injury. The act is one which relates to the liability of railroad companies engaged in interstate commerce to their employees while engaged in such commerce. The power of Congress to deal with the subject comes from its power to regulate commerce between the States.

"Prior to this act Congress had not deemed it expedient to legislate upon the subject, though its power was ample.

" 'The subject,' as observed by this court in Mondou v. Railroad, 223 U. S. 1, 54, 'is one which falls within the police power of the state in the absence of legislation by Congress.' [N., C. & St. L. Ry. Co. v. Alabama, 128 U. S. 96, 99.] By this act Congress has undertaken to cover the subject of the liability of railroad companies to their employees injured while engaged in interstate commerce. This exertion of a power which is granted in express terms must supersede all legislation over the same subject by the States. Thus, in Gulf C. & S. F. R. Co. v. Hefley, 158 U. S. 98, 104, it was said in reference to State legislation touching freight rates upon interstate freight which conflicted with the legislation of Congress upon the same subject, that:

" 'Generally it may be said in respect to laws of this character that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the States, is subordinate to those in terms conferred by the Constitution upon the nation. "No urgency for its use can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution." [Henderson v. Mayor of New York, 92 U. S. 259, 271.] "Definitions of the police power must, however, be taken, subject to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land." [New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 661.] "While it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail." [Morgan's S. S. Co. v. Louisiana Board of Health, 118 U. S. 455, 464.]'

"It therefore follows that in respect of State legislation prescribing the liability of such carriers for injuries to their employees while engaged in interstate commerce, this act is paramount and exclusive, and must remain so until Congress shall again remit the subject to the reserved police power of the states." In the Second Employers' Liability Cases, 223 U. S. 1, the court said, l. c. 46:

"The principal questions in these cases as discussed at the bar and in the briefs, are: 1. May Con-

gress, in the exertion of its power over interstate commerce, regulate the relations of common carriers by railroad and their employees, while both are engaged in such commerce? 2. Has Congress exceeded its power in that regard by prescribing the regulations which are embodied in the act in question? 3. Do these regulations supersede the laws of the States in so far as the latter cover the same field? 4. May rights arising under those regulations be enforced, as of right, in the courts of the States, when their jurisdiction, as fixed by local laws, is adequate to the occasion?''

Continuing on page 53 the court said regarding the question there:

''The third question, whether those regulations supersede the laws of the States in so far as the latter cover the same field, finds its answer in the following extracts from the opinion of Chief Justice MARSHALL in McCulloch v. Maryland, 4 Wheat. 316.''

And on pages 54 and 55, the court said:

''True, prior to the present act the laws of the several States were regarded as determinative of the liability of employers engaged in interstate commerce for injuries received by their employees while engaged in such commerce. But that was because Congress, although empowered to regulate that subject, had not acted thereon, and because the subject is one which falls within the police power of the States in the absence of action by Congress. . . . The inaction of Congress, however, in nowise affected its power over the subject. . . . And now that Congress has acted, the laws of the States in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is.''

In the opinion in McCulloch v. Maryland, referred to, 4 Wheat. 406, Mr. Justice MARSHALL said:

''The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the Constitution, form the

supreme law of the land, 'anything in the Constitution or laws of any State to the contrary notwithstanding.' "

Also in the case of Gulf Ry. Co. v. Hefley, 158 U. S. 98, the question being whether a statute of the State of Texas which was in conflict with the Interstate Commerce Act, had any force, the court said, l. c. 103:

"The question is not whether, in any particular case, operation may be given to both statutes, but whether their enforcement may expose a party to a conflict of duties. It is enough that the two statutes operating upon the same subject-matter prescribe different rules. In such case one must yield, and that one is the State law."

Continuing on page 104, the court further said:

"Generally it may be said in respect to laws of this character, that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the State, is subordinate to those in terms conferred by the Constitution upon the nation."

In the case of Adams Express Company v. Croninger, 226 U. S. 491, the question was whether or not a contract between plaintiff in error and defendant in error, the plaintiff below, limiting the shipper's recovery to an agreed value, was invalid. The local law of the State was that such contract was invalid, and the shipper was entitled to recover the actual value. The shipment was an interstate shipment. The court held that the Act of Congress of June 29, 1906, controlled, saying, page 500:

"But it is equally well settled that until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular State, although engaged in the business of interstate commerce, for loss or damage to such property, may be

regulated by the law of the State. Such regulations would fall within that large class of regulations which it is competent for a State to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the State over such carriers and its duty and power to safeguard the general public against acts of misfeasance and non-feasance committed within its limits, although interstate commerce may be indirectly affected.''

Mr. Justice LURTON, quoting, on page 505, said:

''The Congressional action has made an end to this diversity, for the national law is paramount and supersedes all State laws as to the rights and liability and exemptions created by such transactions. This was doubtless the purpose of the law; and this purpose will be effectuated, and not impaired or destroyed by the State court's obeying and enforcing the provisions of the Federal statute where applicable to the fact in such cases as shall come before them.''

On the same page he further said:

''Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all State regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the State upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the State ceased to exist.''

In the case of the State of Missouri v. Wabash Railroad Co., 238 Mo. 21, the defendant was proceeded against for a violation of sections 7818 and 7819, Revised Statutes 1909, regarding the hours of labor of railroad trainmen. The violation occurred in February, 1907. The evidence showed that the conductor who violated the statute was engaged in interstate commerce. There this court held that the same subjects

were covered by the Act of Congress of March 4, 1907, regarding the hours of labor, and therefore our statutes on the same subject were abrogated. The language of this court was as follows:

"Consequently, in the case at bar, we are compelled to hold that, since the Act of Congress before mentioned covers the same subjects or classes of legislation that are covered by the Act of the Legislature of 1905, the former nullifies the latter as completely as if it had never been enacted."

And in Rich v. St. L. & S. F. R. R. Co., 166 Mo. App. 379, is a case exactly in point. There the widow of decedent sued under the State law. Defendant set up in its answer that the plaintiff could not maintain the suit because it arose under the Federal Employers' Liability Act, alleging the facts. On motion, the court struck out these allegations of the answer. The court speaking through NORTONI, J., said, l. c. 389:

" 'And now that Congress has acted, the laws of the states, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is.' " This last quotation was from Smith v. Alabama, 124 U. S. 465.

On page 390 the court said:

"It is, therefore, obvious that, though plaintiff did not declare upon the Employers' Liability Act, she nevertheless may not maintain this suit under our statute, for the right of recovery is given by the authority of Congress to the personal representative of her husband for the benefit of herself and his children. The court erred in striking out the portion of the answer above mentioned and in denying defendant the right to show the facts therein set forth."

In the case of Eastern Ry. Co. of New Mexico v. Ellis, 153 S. W. 701, the plaintiff sued in her individual capacity as widow on behalf of the parents of decedent and as the next friend of the minor children. She sought to recover under the Federal Employers' Lia-

bility Act of 1908. Defendant set up that plaintiff could not maintain the action because under the Federal act the right of recovery was limited to the personal representative of decedent. Plaintiff also alleged in her petition that she was suing upon a Texas statute. The trial court held that the State statute was superseded by the Federal statute, and if plaintiff had any cause of action it was under the Federal statute. Upon appeal, appellant contended that that provision of the Federal act requiring that a suit should be brought by a personal representative is directory only and not mandatory. The Supreme Court held that the plaintiff was not entitled to a recovery under the State statute.

There are many other cases both State and Federal, of like import. Those cited and reviewed, as well as others, in effect hold that a corporation engaged in such business is an instrumentality of interstate commerce, as well as its employees, and physical property, such as the road itself. That being true, I am unable to comprehend upon what ground it can be logically contended that a car, though empty, which is being hauled from one State to another in order to receive articles of interstate commerce, is not likewise an instrumentality of such commerce.

It is a well known fact that the freight and passenger traffic moves periodically, first in one direction, and then in the other. For instance, the great wheat and corn crops, as well as the cattle and hogs, of the West are, during the fall and winter months, shipped East. This requires many thousand of cars, far in excess of the number that is required, at that time, for the transportation of the manufactured articles and other commodities of the East destined for the West. The same is true of passengers. During the summer months and vacations of various kinds, great hordes of people go to the northern and western resorts, and even to the European, in order to escape the heat and

seek comfort, as well as to avail themselves of more congenial climes and view the lands and scenes of historical renown. This condition of things tests the capacity of common carriers one way, and compels them to haul the movable instrumentalities of transportations loaded one way and empty the other. In the very nature of the business, these empty cars must be returned, in order to carry the remaining freight and passengers not able or ready to go at an earlier date, and to accommodate the ordinary traffic in ordinary seasons.

We must presume that Congress was familiar with these natural conditions, or rather conditions created by natural causes, and had them in mind when the act of Congress under consideration was enacted.

Entertaining these views, I am satisfied that the Supreme Court of Virginia took too narrow a view of said act, and which, if adhered to, would greatly hamper and cripple interstate and foreign commerce, for the reason that there can be no intrastate or interstate commerce without the common carrier is authorized to return his or its empties, from the points of delivery of freight and passengers, to the intermediate and the other end of the road. They must have empty cars, boats and ships before they can be loaded with freight or passengers destined for interior or foreign points or ports.

If our foregoing observations are sound, then all agree, the court and counsel for both parties, that the plaintiff cannot maintain this suit under the Missouri statute, but must proceed, in order to recover, under the Act of Congress previously mentioned. That is for the reason, as briefly stated in the case of the State of Missouri v. Wabash Railroad Company, supra. As previously indicated, the plaintiff cannot recover in this case.

II. The conclusions reached in paragraph one of this opinion render it unnecessary to undertake to answer the second interrogatory propounded at the beginning of this opinion, for the reason that the conclusions so reached completely dispose of this case.

We are, therefore, of the opinion that the judgment should be reversed and the cause remanded to the circuit court with direction to dismiss plaintiff's petition.

It is so ordered. *Lamm, J.,* concurs in separate opinion; *Graves, J.,* concurs; *Bond, J.,* concurs in result.

LAMM, J. (concurring).—On this record, the most favorable view possible for respondent is that her husband was fireman on a locomotive drawing a train of *empty* freight cars from Moulton in Iowa to Moberly in Missouri, on the Wabash, an interstate railroad. These cars, the testimony shows, were mostly headed for St. Louis, Missouri, belonged to other roads, and were intended for distribution at St. Louis to the carriers owning them. On such a record, though doubting much at the hearing, I am constrained to concur in the opinion of our learned Presiding Judge, putting my concurrence on the ground that the final arbiter on the question has spoken.

In North Carolina R. R. Co. v. Zachary, Administrator of Burgess, 232 U. S. 248, where the precise point was in judgment, Mr. Justice PITNEY spoke for the whole court in holding, first, that the Federal Employers' Liability Act is *in pari materia* with the Federal Safety Appliance Act; and, second, that the hauling of *empty* cars from one State to another is interstate commerce within the meaning of said Employers' Liability Act.

An excerpt from that case, encompassing the sum of the matter, will not be amiss:

"There seems to be no clear evidence as to the contents of these cars, and it is argued that, in the absence of evidence, it is as reasonable to infer that they were empty as that they were loaded; and that it was incumbent upon defendant to show that they contained interstate freight.  We hardly deem it so probable that empty freight cars would be hauled from the Virginia point to Spencer.  But were it so, the hauling of empty cars from one State to another is, in our opinion, interstate commerce within the meaning of the act.  Such is the view that has obtained with respect to empty cars in actions based upon the Safety Appliance Act of March 2, 1893 (27 Stat. 531, c. 196).  [Johnson v. Southern Pacific Co., 196 U. S. 1, 21; Voelker v. Railway Co., 116 Fed. 867, 873.]  And the like reason applies, as we think, to actions founded upon the Employers' Liability Act, which, indeed, is *in pari materia* with the other."

As appositely put by Hook, Circuit Judge, speaking for the Circuit Court of Appeals, in Chicago, M. & St. P. Ry. Co. v. United States, 165 Fed. 423, if these cars had been loaded on flat cars and were being transported in that fashion from Iowa to Missouri, there could be no shadow of question but that their carriage would be interstate commerce.  Such being the case, what difference does it make in principle that they were being run on their own wheels and coupled by their own coupling to each other and to the engine?  In other words, the traffic of interstate commerce "may as well consist of the property of carriers as the property of merchants."

Learned counsel for appellant cite a line of cases under the Safety Appliance Act showing that under circumstances here the Safety Appliance Act would apply; hence if that act, as held by Mr. Justice Pitney, supra, is *in pari materia* with the Federal Employers'

Liability Act and if the two are to be construed together, that line of cases is directly in point. It was on that theory such cases were used by Mr. Justice PITNEY to support the judgment in North Carolina Ry. Co. v. Zachary, Admr.

That when the Congress of the United States, under its constitutional power of regulating interstate commerce, has occupied the field by its statute, the State damage act must give way, *pro tanto,* where the two overlap in remedy, is not to be questioned for a moment. However much the State bench and bar may revere the old landmarks of our statute on damages, they must be willing to see that statute yield when the paramount authority of the Federal Government once takes over any phase of the regulation of interstate commerce and the liability of carriers in that line of business, as it has done in this instance.

Wherefore, I vote to concur.