# CORA SELLS v. ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Appellant.

## Division One, December 2, 1915.

1. **PARTY TO ACTION: Against Interstate Carrier: Negligent Death of Employee: Wife or Administratrix.** An action for damages for the negligent killing of an employee of a railroad company engaged, at the very instant of his negligent injury in this State, in interstate commerce, should, in view of the Employers' Liability Act of Congress, be brought by decedent's legal representative, and cannot be maintained by his widow in her individual name under section 5425, Revised Statutes 1909. The action does not accrue to her as an individual, but accrues to decedent's legal representative.

2. ———: ———: ———: ———: **Waiver: By Failure to Plead.** Nor did the railroad company waive the point that the action for damages was wrongfully brought in the widow's individual name, instead of in her representative capacity, as decedent's administratrix, by failing to plead the Federal Employers' Liability Act in bar to the action, or by proceeding to trial as if the action had been properly brought and prosecuted under the State statute, if the petition alleged the railroad company was an intrastate carrier, and the answer was, among other pleas, a general denial, for such an answer raised the issue of the company's intrastate character.

3. **PLEADING: Office of General Denial.** Under the Code of Missouri the function of a general denial is simply to put in issue the facts pleaded in the petition, not the liability.

4. ———: ———: **Corporation: Pleading Under Oath.** A charge in the petition that defendant is a corporation is taken as true, unless defendant denies the same under oath. But an answer unaccompanied by such oath admits only the defendant's corporate existence; it does not admit the character of the corporation, such, for instance, that it is an intrastate carrier.

5. **PARTY TO ACTION: Against Interstate Carrier: Scope of Federal Employers' Liability Act.** The Employers' Liability Act of Congress completely covered the subject of the liability of an interstate carrier to its employees, and superseded all State statutes on the subject; and as it provides that an action for the negligent killing of such an employee accrues to his legal representative, the State statute, authorizing such action to be brought by his widow, is no longer operative, but as to interstate carriers has been *pro tanto* repealed by the exercise by Congress of its constitutional power to regulate commerce among the States.

6. ———: ———: ———: Waiver. Nor can such superior power of Congress be waived, for said Employers' Liability Act gives to the legal representative of the negligently killed employee of the interstate carrier a cause of action, and the undisputed facts being that defendant is an interstate carrier, a petition alleging it to be an intrastate carrier states no cause of action under superseded section 5425, Revised Statutes 1909. *Held*, by GRAVES, J., concurring, that the right of the widow to recover damages for the negligent killing of her husband is purely statutory, and is given her by the State statute; but the Employers' Liability Act of Congress, as to interstate carriers and their employees, superseded and *pro tanto* repealed that statute, and left to the widow no cause of action, but declared such cause of action should accrue to his legal representative; and therefore a petition which alleges defendant railroad company was an intrastate carrier and names her, as his widow, in her individual capacity, as plaintiff, states no cause of action, when it.is shown that defendant is an interstate carrier.

7. ———: ———: ———: ———: Raised by Demurrer, Etc. Whenever a petition fails to state facts sufficient to constitute a cause of action under the law, that vice may be taken advantage of by demurrer, or objection to the introduction of testimony, or by any other appropriate plea filed at any time in any court in which the case is pending.

8. ———: ———: Federal Employers' Liability Act: Not Pleaded:. Waiver. Nor does the interstate defendant waive the supremacy of the Federal Employers' Liability Act and its control of the suit for damages for the negligent killing of its employee, by not pleading it and by trying the case as if properly brought and prosecuted under the State statute, for the reason such act is a public act, of which all courts must take judicial notice, and being such it is not necessary to plead it, and for the further reason that the act having superseded the State statute on the subject, no cause of action exists without it.

9. ———: ———: ———: Waiver: Pleading Contributory Negligence. The plea of contributory negligence by the interstate carrier is not inconsistent with the Employers' Liability Act of Congress. Under it contributory negligence can be shown in mitigation of damages, and therefore must be pleaded; while under the State statute contributory negligence is a defense.

10. ———: ———: ———: Change in Pleading. It was not the design of the Federal Employers' Liability Act to change the principles and forms of pleading, especially where the case is brought under that act in a State court.

Appeal from Carroll Circuit Court.—*Hon. Francis H. Trimble,* Judge.

REVERSED AND REMANDED *(with directions).*

*Thomas R. Morrow, George J. Mercereau, John H. Lathrop* and *Jones & Conkling* for appellant.

This suit was improperly brought. If a cause of action accrued against the defendant, it accrued in favor of the legal representative of the deceased under the Federal Employers' Liability Act. Thompson v. Railroad, 262 Mo. 468; Moliter v. Railroad, 180 Mo. App. 84; Rich v. Railroad, 166 Mo. App. 379; Railroad v. Vreeland, 227 U. S. 59; Second Employers' Liability Cases, 223 U. S. 1; Railroad v. Hesterly, 228 U. S. 702; Oliver v. Railroad, 196 Fed. 432.

*L. H. Woodyard* and *Busby & Withers* for respondent.

The Federal question was waived. The defendant not only failed to set up the Federal Employers' Liability Act at any time in the trial court, or in any wise call the trial court's attention to the same, but joined issue with the plaintiff and tried the case throughout under the State law, and to permit the defendant to set up the Federal act for the first time in this court would be against the rule of appellate procedure that a case will not be reversed because of error not called to the attention of the trial court, and that a party will not be permitted to try his case upon one theory below and upon a different theory above; and, although the Federal act may have been applicable, had it been properly set up in the trial court, it should be held that the defendant has waived the question in this court by its conduct below. It is true that the defendant objected to the introduction of any evidence; also tendered a demurrer to plaintiff's evidence in

chief; also at the close of all the evidence asked a peremptory instruction that the plaintiff was not entitled to recover; also in its motion for new trial alleged as error the overruling of defendant's objection to the introduction of any evidence and the overruling of its demurrer to the evidence, and in refusing its peremptory instruction, and also in its motion in arrest of judgment alleged that the court had no jurisdiction to try the cause or of the cause of action, and that upon the entire record plaintiff was not entitled to recover, and that plaintiff's petition did not state facts sufficient to constitute a cause of action; but these were simply the ordinary and usual objections set up by a defendant in an action under the State law, and the defendant's objection therein to the jurisdiction of the court over the cause of action referred, or was understood by the court to refer, to the fact that the defendant had filed a petition to remove the cause to the Federal court because of the diversity of citizenship, which petition had been overruled. The objection to the jurisdiction of the court could not be understood to refer to the Federal Employers' Liability Act, as the court was given jurisdiction over the cause by the express provisions of that act, as well as by the State law. It is also true that for the purpose of proving that Train No. 6 was a fast train and not scheduled to stop between Carrollton and Marceline, the plaintiff proved by witness Geary that Train No. 6 was a "through train," and plaintiff also proved by the cross-examination of witness Witter that said train was a "through train" for the purpose of showing that it was a train upon which the lights were turned low about ten o'clock at night; and plaintiff also proved by the cross-examination of Witter and possibly other witnesses that said train was operated from Kansas City, Mo., to Shopton, Iowa, without an electric headlight, for the purpose of emphasizing negligence; and the defendant itself proved by witness Geary that

Train No. 6 ran through Missouri, Iowa and Illinois; and defendant proved by witness Clancey that said train ran from Denver through Kansas City and across Illinois to Chicago, and the defendant also proved by its conductor, Montrose, that said train ran from Kansas City to Fort Madison, Iowa.   But this proof was made by the defendant only in a casual way, without either the court or the plaintiff being at any time apprised of an intention on the part of defendant to set up any rights under the Federal act; and an examination of the record will disclose that the defendant never, at any time, mentioned or set up the applicability of the Federal act in the court below during the progress of the trial, nor in its motions for new trial or in arrest of judgment.  The defendant not only failed to set up the Federal act, but its conduct in the court below was entirely inconsistent with any such claim.   The plaintiff's petition was based solely on the second section of the Missouri Damage Act, and the defendant, in its answer, pleaded contributory negligence as a bar to the action, which plea was not permissible under the Federal act.   The defendant also filed its petition to remove the cause to the Federal court, which removal was expressly prohibited by the Federal act, and the defendant renewed its plea of contributory negligence and also its right to remove the cause in its motions for new trial and in arrest of judgment; and the defendant also, by its objection to the introduction of evidence and its instructions to the jury, tried the case throughout as if contributory negligence on the part of the deceased was a complete bar to the action.   It is clear from the record either that the defendant did not intend to claim any rights under the Federal act in the trial court, and that the claim now set up by it in this court for the first time is an afterthought, or else that it intended to conceal such defense from the trial court and the plaintiff until the case should be passed upon by the appellate court, when it

thought perhaps the rights of recovery under the Federal act would be barred by the two-year period of limitation provided in the Federal act. Had it been the intention of defendant's able attorneys to raise the question in the trial court they would have done so clearly, and the fact that they did not do so either in their answer, motion for new trial, or otherwise during the trial, shows conclusively that for one reason or the other it was not their intention to bring the question to the attention of the trial court, or have it consciously passed upon by the trial court. And inasmuch as the question was not brought to the attention of and consciously passed upon by the trial court, the defendant should not be permitted to raise the question for the first time in this court. It being clear that the question was never brought to the conscious attention of the trial court, this court, in permitting the defendant to raise the question at this time, would have to hold that the defendant may lie in ambush for the plaintiff and conceal its intended defense from the trial court and the plaintiff until the case reaches this court. Such a holding would be to say that the rules of procedure are snares and pitfalls, which holding this court will refuse to make. Whether the defendant and the deceased were engaged in intrastate commerce, or interstate commerce, at the time of his death, was peculiarly within the knowledge of the defendant, and it should have plainly set up that defense in the trial court if it intended to make it. Had it set up the defense in the trial court, and brought it to the attention of the plaintiff, she could have amended the petition by making the personal representative of her husband's estate the party plaintiff, and proceeded under the Federal statute. Railroad v. Wulf, 226 U. S. 570. It will appear from the following cases that under the great weight of authority the appellant cannot spring this question for the first time in this court:

Leora v. Railroad, 146 N. W. 522; Hahson v. Railroad, 146 N. W. 524; Graber v. Railroad, 150 N. W. 489; Bradbury v. Railroad, 128 N. W. 1; Pelton v. Railroad, 150 N. W. 242; Bitondo v. Railroad, 149 N. Y. S. 339; Mims v. Railroad, 85 S. E. 372; Railroad v. Rogers, 150 S. W. 283; Smith v. Railroad, 140 Pac. 685; Railroad v. Woodford, 153 S. W. 727; Railroad v. Woodford, 154 S. W. 1083; Railroad v. Woodford, 34 U. S. Sup. Ct. Rep. 739; Fleming v. Railroad, 76 S. E. 212.

WOODSON, J.—The respondent instituted this suit in the circuit court of Carroll county under the second section of the Damage Act, to recover the sum of $10,000, damages sustained by her through the alleged unlawful and negligent conduct of the appellant in killing her husband, John Sells, an employee of the company.

The petition was in the usual form, alleging that the appellant road was an intrastate carrier, and the answer contained a general denial, a plea of contributory negligence and an assumption of risk.

The trial before the court and jury resulted in a verdict and judgment in favor of the respondent for the sum of $8,000.

In due time and in proper form the appellant appealed the cause to this court.

The appellant's evidence tended to show the following facts:

That while the pleadings did not disclose the fact, yet the evidence showed that the appellant was an interstate railroad, and was actually engaged in the transportation of interstate commerce at the very instant the husband of respondent was struck and killed by appellant's Train No. 6, which was bound from Kansas City, Missouri, to Chicago, Illinois; nor was there any evidence introduced to the contrary.

In.fact the evidence of both parties conclusively shows that the road was an interstate carrier.

John Sells and the respondent were, at the time of the injury, husband and wife, and he was about twenty-two years of age and possessed of all of his faculties. He was an employee of the appellant as a night watchman or track walker in the vicinity in which he was killed. It was his duty to walk over the track of appellant after each train passed, to see that it and the roadbed were all right before the next train came; and he had been engaged in that work for a period of about eight months before the date of his death, which was on the night of October 15, 1911. He usually went on duty about seven-thirty o'clock in the evening and remained until daylight the next morning. His home was at Dean Lake, the first station on appellant's road east of the town of Bosworth.

On October 15, 1911, about seven-thirty p. m., he left his home at Dean Lake, taking with him a bucket containing his midnight lunch. He was not seen alive again. There was no eye-witness to the accident that resulted in his death. The following morning his body was found at what is known as the "Kirker Crossing." This crossing is about two miles northeast of Bosworth and about four or four and one-half miles west of Dean Lake. The Kirker Crossing is a public wagon road crossing running north and south across defendant's railroad tracks, which runs in a northeasterly and southwesterly direction. The body of plaintiff's husband, when found, was lying about six feet north of the railroad track and about fifteen or twenty feet west of the wagon track. His hat was lying fifteen or twenty feet northeast of his body; his dinner bucket, about twenty feet east of him and north of his hat. It was the custom of plaintiff's husband to carry with him two lanterns—one white, the other red. These he had with him when he left home the evening of the 15th to go on duty. The following morning, when his body was

found, the white lantern was sitting on the cattle guard a little west of the center and leaning against the wing fence. The red one was sitting at the end of the cattle guard, right at the end of the wing fence. An examination of deceased showed that his skull was broken on the right side of the head near the temple and his left hip was bruised.

Deceased was familiar with the different trains passing over defendant's railroad, as well as with the time cards and schedules of the trains. In fact, he had a time card of his own which familiarized him with the running time of the trains.

Just west of the road crossing were the cattle guards and wing fences. The wing fence had recently been painted white. It had rained somewhat the night previous. An examination of the fence the next morning when the body of deceased was found, showed footprints of mud on the bottom boards, while white paint corresponding in color and appearance with the paint on the fence was found on the seat of deceased's trousers, indicating that he had been sitting on the wing fence.

From the Kirker Crossing where the body of deceased was found the railroad track west, for a distance of about one thousand feet, was straight and the view unobstructed.

Train No. 6, the one which struck and killed deceased, was an east-bound passenger train running from Kansas City to Chicago. Its Kansas City leaving-time was seven-thirty p. m. and it left Kansas City on or about schedule time on the evening of the 15th. Between Kansas City and Kirker Crossing it had lost considerable time. If it had been running on schedule time, it would have passed Bosworth at ten-fifteen, but on the night in question it did not pass Bosworth until 11:49; and Kirker Crossing at 11:52 or 11:53.

At or near Sheffield, which, in fact, is at the eastern edge of Kansas City, something went wrong with

the electric headlight on the engine. The employees in charge of the train being unable to repair it, placed a railroad lantern in the headlight cage, in front of the reflector, which, some of the evidence for the appellant tended to show, illuminated the track some forty or fifty feet, while most of that for the respondent tended to show that it did not illuminate the track but for a few feet, and two or three of her witnesses testified that the lantern was not burning at the time of the injury. A number of the coach lights were burning all the time and their light reflected out of the windows. The train was also provided with markers at the rear end, being red and green lights, which projected out six or eight inches from the coaches.

Upon the other hand the engineer, brakeman and conductor all testified that the lantern was continuously in the headlight cage and burning until the train reached Ft. Madison, Iowa. Not only that, but the night operators at Bosworth, Dean Lake and Marceline all testified to the fact that the lantern was in the headlight cage and burning as the train passed through these several stations.

At Floyd, a station on defendant's road, Montrose and Clancy, conductor and engineer, respectively, in charge of the train, wired to the dispatcher's office: "Headlight on Engine 557 out of order; running with a lantern for headlight."

The appellant's evidence tended to show that the engine bell was ringing when the Kirker Crossing was reached and crossed and had been since the train left Kansas City. That engine was equippel with an automatic bell, provided with air-bell power and when set to ringing, it continues to ring until the air valve is shut off.

The evidence tended to show that a person at the Kirker Crossing seated on the wing fence could have seen the light from the lantern in the headlight cage

on the approaching train as far as the track was straight—a quarter of a mile west.

A person who was seated on the wing fence, as indicated by the mud prints and disturbed paint, in a leaning or stooping posture, would be struck on the head by the pilot on the engine.

The evidence for the respondent was substantially as follows:

That on the morning of October 16th, mud, apparently off of the feet of the deceased, was found on the cattle guards and also on the lower board of the wing fence; also that white paint or whitewash off of the newly-painted wing fence was found on the seat of his trousers, and signs of his having sat on the fence were found near the middle of the second board thereof; also that a small lunch can, carried in his lunch basket, was found empty, or partly empty, with his white lantern, sitting on the cattle guard near the center of the wing fence, and a spoon, broken dishes, food and bread crusts were found strewn along a disturbance of the earth and cinders.

Leland Jones and Harry Crispin testified that they drove over the Kirker Crossing at about twelve o'clock that night (just after an east-bound train had passed, the headlight and crossing signals of which Jones could not see or hear), and that they saw deceased's burning lanterns sitting where they were found the next morning, but did not see the deceased, and that Jones's horse shied around some object lying east of the wing fence and just west of the traveled road (evidently Sells's body) where the body was found lying the next morning. The deceased's body was cold and stiff at nine o'clock next morning when found.

The testimony of witness Geary and other witnesses shows that the distance from Bosworth to Dean Lake is 6.2 miles; and the testimony of witness Humpston, and the operator's train register kept by him, show that Train No. 6, on the night of October 15, 1911,

passed Bosworth at 11:49 o'clock p. m. and Dean Lake at 11:58 o'clock p. m., thus running six miles in nine minutes, and therefore at the rate of forty miles an hour at the time it struck and killed the deceased.

The testimony of witness Geary and other witnesses shows that Train No. 6 was due at Bosworth, according to its regular schedule time, at 10:15 o'clock p. m., and at Dean Lake at 10:27 o'clock p. m., and the operator's train register shows that train No. 6, on the night of October 15, 1911, passed Bosworth at 11:49 o'clock p. m. and Dean Lake at 11:58 o'clock p. m., being more than an hour and a half late at the time it struck and killed the deceased.

The engineer, Clancy, testified that there was no whistling post west of the crossing, excepting one on the south side of the south track at least forty feet south of a train on the north track, and that the lantern headlight, even if burning, would not illuminate the sides of the track to exceed five to twelve feet, nor far enough to show a whistling post located forty feet from the track, and also that there were no whistling posts at the two curves west of the crossing, and that these were very slight curves in the track. He gave as the reason for knowing that he sounded the crossing whistle on this dark, stormy night, the fact that a whistling post was located on the north track west of the crossing.

Sam Sparkman, an engineer, testified that a brakeman's lantern sitting on the extension of a headlight cage out in front of the reflector would make only a faint light with no material reflection, and would not illuminate the sides of the track sufficiently to disclose the location of a whistling post, especially a post located on the south side of the south track forty feet from the side of the engine.

Witness Lathem, Lou Keenan and Frank Dodd testified that the north- or west-bound track which deceased was watching and upon which he was killed was

a new track, and that the south- or east-bound track was the old track at the Kirker Crossing; that east-bound trains were then temporarily using the north track, but that there was not then and never has been a whistling post located on the north track west of the crossing, the only whistling post on the west side of the crossing being the one eighty rods west of the crossing on the south side of the south- or east-bound track, and at least forty feet south of the north track.

Leland Jones testified that he had resided within three-fourths of a mile of the Kirker Crossing and had traveled over it for twenty-one or twenty-two years; that as he approached the crossing in a buggy between 11:30 and 12 o'clock on the night of Sells's death he saw an east-bound passenger train, but did not hear anything of it until he was right on the crossing, and the train was then right in front of him; that he was in position to see and hear, and if any crossing signals with whistle or bell were given for the Kirker Crossing he did not hear them. It also appears from this witness's testimony that he returned to the crossing the next morning before the body of Sells was removed.

It was further shown by the witnesses that on the night of Sells's death it was raining, storming and thundering, and that the wind at 12 o'clock that night at Dean Lake and at the Kirker Crossing was blowing from the east or northeast.

It is also undisputed that the deceased possessed good eyesight and good hearing, was strong and capable, and a careful and trusted employee of the defendant.

That the noise of the train was not sufficient to enable the deceased, in the exercise of ordinary care, to know of the approach of the train in time to reach a place of safety.

It was proven that the track upon which deceased was killed was down grade twenty-five feet to the mile, or one-half of one per cent down grade, for a distance

of one and one-half miles approaching the Kirker Crossing from the west.

Witness Coney, an engineer, testified that a passenger train such as No. 6, running at the rate of forty miles per hour on a down grade twenty-five feet to the mile, would not be working steam and would make very little noise, and that the direction of the wind would materially affect the power of one on the track to hear the train.

Charles Bowlby, an engineer, testified that a train such as No. 6, running on a down grade of one-half of one per cent with steam shut off, would make very little noise, as compared with an engine working steam, and with the wind in the opposite direction from the train it would not be heard by one on the track until within 150 or 175 feet.

In a test made by witness Lathem, while he was stationed near the wing fence at the Kirker Crossing, and while especially listening for the purpose, and with the electric headlight brightly burning, and without an unfavorable wind, he ascertained that one at the crossing could not hear the noise or rattle of two east-bound passenger trains until such trains were within 300 to 400 feet of the crossing; and that if running at the rate of forty miles per hour a train would run the 400 feet in 6.8 seconds and the 300 feet in about 5 seconds.

In a test made by witness Cook while he was stationed at the wing fence at the Kirker Crossing and especially listening for the purpose, and with the electric headlight burning brightly and without an unfavorable wind, he ascertained that two east-bound passenger trains could not be heard until within 300 feet of the crossing.

Dennis Smart, a fireman, testified that a passenger train such as No. 6, running on a down grade twenty-five feet to the mile with the steam off and the train drifting, and with the wind in the opposite direction, would get within 150 to 200 feet of one at the crossing

before it would be heard; that seventy-five per cent of the usual noise of such a train would be eliminated under such circumstances.

Sam Sparkman, an engineer, testified that a passenger train such as No. 6, running on a down grade twenty-five feet to the mile, with the steam shut off, while it was running, and with the wind in the opposite direction, and without other warning of its approach, would get within 150 feet of one at the crossing, or strike him before he would hear it; about seventy-five per cent of the usual noise of the train would be eliminated under such circumstances.

Lou Keenan testified that while approaching this same Kirker Crossing in a wagon in the daytime one of the defendant's east-bound trains got within 100 feet of him before he heard it.

George O. Manson, section foreman, testified that he lived one-half mile southwest of the Kirker Crossing; that the track was down grade from Bosworth to the Kirker Crossing, and admitted that when trains are running on that down grade the exhaust of the engine is shut off and they make very little noise, and that it was a rainy evening on the night of Sells's death.

John Clancy, the engineer in charge of Train No. 6, admitted that the steam was shut off of the engine and the train drifting on the down grade for a distance of one and one-fourth miles west of the Kirker Crossing, and that the train drifted, that is, ran entirely of its own momentum, without the engine laboring, from that time until it passed the crossing.

Lawson Witter, the fireman on Train No. 6, admitted that the steam on the engine was shut off when the train tipped over the hill one and one-fourth miles west of the Kirker Crossing, and that the train drifted, that is, ran entirely of its own momentum, without the engine laboring, from that time until after it passed the crossing.

Frank Roff, bridge inspector for defendant, testified that an engine exhausting steam and laboring makes a great deal more noise than when drifting; that a train running on a down grade twenty-five feet to the mile, with the steam shut off, would make a great deal less noise than when running on a level track; and that if the wind were in the opposite direction it would tend to drive away the noise of the train.

That all the passenger and freight trains on defendant's road were equipped with strong electric headlights which he could have seen for many miles on a straight track, and which on a train approaching from the west would have reflected about him and on the trees and objects in front of him when the train was as far away as one-half or three-fourths of a mile west of the crossing; that it was very unusual for a train on defendant's road to operate without such electric headlight; and that by reason of these facts he was probably lulled into a sense of security and led to believe that no train was approaching until it was right on him, in the absence of any reflection from a headlight.

That Train No. 6, which struck Sells, was more than an hour and a half late, and he had no means of knowing of the time of its approach excepting by the headlight or other sufficient warning.

Notations or entries made at the time in the regular course of business on the train sheet in the train dispatcher's office at Marceline stated that Train No. 6, on the night of October 15, 1911, lost seventeen minutes of time on the Second District, that is, between Kansas City and Marceline, on account of "no headlight."

Witnesses Arthur Lawson, Squire Lynn and Ed Stevens testified that they saw an east-bound passenger train go through Dean Lake, only about three and one-half miles east of where Sells was killed, at about 12 o'clock on the night of Sells's death, without any head-

light at all, lighted or burning, in front of the engine.

Dennis Smart, a fireman, testified that the light in a brakeman's lantern, even if burning, is smaller than in an ordinary lantern, and sitting on an extension of the headlight cage out in front of the reflector, it would not cast any reflection ahead and would be very deceptive and not resemble in appearance either an electric or regular oil headlight on a train; that until the train. got close enough, say within fifty feet, for one to see both the lantern in the cage and the track below, he could not tell whether the light was twelve or three feet above the track; and that the engineer and fireman on Train No. 6 doubtless put the lantern in the cage more to protect themselves from the company than for the purpose of illuminating the track.

Sam Sparkman, an engineer, testified that a brakeman's lantern set on the extension of the headlight cage, out in front of the reflector, would make only a faint light with no material reflection, and would not illuminate the track more than fifteen or twenty feet ahead of the pilot; that the bottom of both the cage extension and the lantern are round and circular, so that the lantern would in a manner set on a pivot and soon tip or turn over from the jostling and jerking movement of the engine; that such a light, even if burning, would be very deceptive and have the appearance of some one on the track with a lantern, as one could not judge the height of it above the track in the darkness, and that the witness, in his experience, had found that such a lantern hung in front of an engine or put in the headlight cage would soon go out.

Witness Coney, an engineer, testified that one on a straight track could see one of the electric headlights in use on the Santa Fe when burning ten miles distant, and that the reflection from it would be 'upon and around one on the track when the train was three-fourths of a mile distant.

Charles Bowlby, an engineer, testified that a brakeman's lantern sitting on the extension of the headlight cage in front of the reflector would not cast any reflection ahead of the train, and would not have the appearance to one on the track of an electric or regular oil headlight, or of an approaching train; and that the ability to see the lantern and markers would depend on the atmosphere.

Witness Mangle, agent for the defendant at Dean Lake, on the night of Sells's death, refused, on the advice of counsel for defendant, to answer the questions at the time of giving his deposition in the case whether he, in the line of duty, received a communication by telephone or telegraph from the defendant's agent at Bosworth on said night after Train No. 6 had passed Bosworth, and before it reached Dean Lake, with reference to the headlight on said train being out.

John Clancy, engineer on Train No. 6, admitted that the electric headlight failed at Sheffield, a suburb of Kansas City, and that he ran the train from Kansas City clear through Missouri to Shopton, Iowa, a distance of 208 miles, on a dark, stormy night, going through many towns and cities, and over on an average a public road crossing every mile, with only a brakeman's lantern sitting on the extension of the headlight cage, and illuminating the track not exceeding fifty feet ahead of the engine; that as his train approached the Kirker Crossing he was looking ahead, but did not see anyone at the crossing; and that the train lost seventeen minutes time running from Kansas City to Marceline on account of the defective headlight.

Lawson Witter, the fireman on Train No. 6, testified that the electric headlight failed because of a defective dynamo between 15th street and Sheffield in Kansas City, and that without stopping the train he simply went out on the running board of the engine and set a brakeman's lantern on the extension of the headlight cage, without hooking or attaching the lantern to any-

thing; that there was a flat place on which to set the lantern, but that the cage extension was not made for the purpose of setting a lantern on it, and he had never before seen a flat place in such an extension and could not imagine any reason for it being there; that the lantern, if burning, would not illuminate the track farther than forty or fifty feet ahead of the engine; that the flame in a brakeman's lantern is smaller and not as bright as in a common lantern, and the metal top and bottom of the lantern would obstruct the reflection of the light and cast a shadow in front of the engine; and that all of the defendant's trains between Kansas City and Fort Madison used strong electric headlights and it was very unusual to run a train without such a headlight.

S. V. Montrose, the conductor on Train No. 6, admitted that Train No. 6 lost seventeen minutes between Kansas City and Marceline on the night of Sells's death because of a defective headlight.

The witnesses Lathem and Cook testified that in a test made by them while standing at the wing fence at the Kirker Crossing, and especially watching the approach of two passenger trains in the early part of a night when it was misting rain, and when all the coach lights were probably burning, the lights from the coaches could not be seen by them until the trains got even with them, that is, that one in the position of Sells directly in front of a passenger train cannot see the lights or the reflection of the lights from the coaches until the train comes up opposite him.

S. V. Montrose, the conductor on Train No. 6, testified that all the lights, thirty or forty in number, each in the chair car and smoking car, excepting only about twelve in each car, were turned out at ten o'clock at night; and it is and was known, of course, from common experience, that few lights were left burning in the remaining five or six sleeping cars on the train at the hour of twelve o'clock at night.

Judge Simpson testified that he sat down on the second board of the wing fence on the morning of October 16th in the place where Sells was supposed to have been sitting, and while he believed that the train would have cleared him (Simpson) when sitting erect, yet that his body would have been close to the train and required to move but slightly forward to be struck by the train, and other evidence in the record shows that one sitting upon the lower board of the fence would have been struck without moving forward.

At the commencement of the trial, defendant objected to the introduction of any evidence, upon the grounds, among others, that the petition did not state facts sufficient to constitute a cause of action and because the court had no jurisdiction over the cause.

Again, at the close of plaintiff's case, defendant tendered a demurrer to the evidence, which was overruled and an exception duly saved, and at the close of all the evidence in the case, defendant requested a peremptory instruction in the nature of a demurrer to the evidence, which was by the court refused, and appellant duly excepted.

At the close of all the evidence the court gave for the respondent eleven instructions covering all the issues of her case; and thereupon the appellant requested the court to give instructions numbered one to four inclusive, submitting the non-liability of defendant, contributory negligence and the assumption of risk, all of which were by the court given; and the court also, of its own motion, gave an instruction numbered three and one-half, defining ordinary care.

The appellant also requested the court to give instructions numbered five and six, which the court refused, as asked, but modified them in slight particulars and gave them as modified, to which action of the court the appellant duly excepted.

The court also, at the request of appellant, gave instructions numbered seven to nineteen, both inclu-

sive, and refused instructions marked R, S, T, U, V, W, X, Y and Z, asked by appellant, making a total of twenty-eight instructions requested by the appellant.

. I.   It is first insisted by counsel for the appellant that the trial court erred in refusing its demurrer interposed at the close of respondent's evidence, and also at the close of all the evidence introduced in the case.

The ground of this insistence is predicated upon the fact that the undisputed evidence in the case conclusively shows that at the time of the

Capacity to Sue: Interstate Carrier: By Wife of Deceased.

injury and death of respondent's husband he was an employee of the appellant, a railroad company, engaged in interstate commerce, and that he was so employed and was performing his duties as such at the very instant of his injury and death; and that upon those facts the suit should have been brought by the respondent in her representative capacity, as administratrix, under the Federal Employers' Liability Act, and not in her individual name under section 5425, Revised Statutes 1909.

There can be no question but what this insistence of counsel for appellant is sound and wellfounded.

The identical question was presented to this court for decision in the case of Thompson v. Wabash Ry. Co., 262 Mo. 468.

After a careful review of the authorities upon the question, especially the decisions of the Supreme Court of the United States upon the subject, which is the final arbiter in all such cases, it was unanimously held that the plaintiff in that case could not maintain such a suit in her individual capacity under the State statute mentioned, but should have brought it in her representative capacity under the Federal Employers' Liability Act, before mentioned.

It would be a useless waste of time, as well as a supererogation of labor, to again review those authorities here.

In fact I do not understand learned counsel for respondent to controvert the correctness of the legal proposition above announced and decided in the Thompson-Wabash case, but seek to evade its effect by the contention that counsel for the appellant waived the question there decided by failing to plead the Federal Employers' Liability Act in bar to this suit and by proceeding to the trial of the cause as though properly brought and prosecuted under the State statute.

We will consider this question of waiver in the next paragraph of this opinion.

II.   Attending the question of waiver before mentioned:   Counsel for respondent contend, first, that since the petition does not disclose the fact that the appellant's railroad was an interstate commerce road, and the answer having failed to plead that fact, the latter must be presumed to have waived that defense; and, second, because counsel for appellant throughout the trial of the cause proceeded upon the theory and conducted the defense as though the suit was properly brought and prosecuted by respondent in her individual capacity under the Missouri statute.

Capacity to Sue: Waiver: Plea of General Denial.

For convenience we will consider these two propositions in the order stated:

(a)   Regarding the first:   It is true the petition of respondent upon which the cause was tried, did not disclose the fact that the road of appellant was an interstate commerce line; but it is true it charged it was an intrastate road and it is also true the answer of appellant did not affirmatively allege that the road was an interstate road, yet it denied the charge of the petition that it was an intrastate line, for the reason the answer consisted of a general denial, a plea of

contributory negligence and an assumption of risk.

It should be borne in mind that the function of a general denial, under the code of this State, is simply to "put in issue the facts pleaded in the petition, not the liability." [Kelerher v. Henderson, 203 Mo. 498, 1. c. 512; Musser v. Adler, 86 Mo. 1. c. 449.]

The amended petition in this case in express terms alleges that the appellant was an intrastate carrier, in the following language:

"2nd.  That defendant, The Atchison, Topeka & Santa Fe Railway Company, is and was on all dates herein mentioned, a railway corporation duly organized under the laws of the State of Kansas, having its domicile therein, and being a citizen and resident of said State of Kansas, and owning and operating a line of steam railway between the towns of Bosworth, Missouri, and Dean Lake, Missouri, and other points in this State."

That being true, the general denial of the answer, according to the well known rule announced in the Kelerher and Musser cases, supra, both in letter and spirit put in issue the intrastate character of the appellant road, as charged in the petition.  In fact, I know of no other mode or manner by which that issue could have been so clearly and pointedly presented.

It should be remembered that section 1985, Revised Statutes 1909, which provides that when a defendant is sued as a corporation, and that fact is charged in the petition, such charge shall be taken as true unless the defendant denies the same under oath, has no application to the question here presented, namely, that the defendant company was an intrastate road.  While the incorporation was admitted the character of the corporation was not admitted by the failure of the affidavit.  But the question as to whether the road was an intrastate or an interstate carrier was one of fact which the plaintiff was required to

plead and prove, just as any other fact, by the evidence, which as before stated she wholly failed to do.

(b)   Moreover, according to all of the decisions of the Supreme Court of the United States discussing this question, it is invariably held that when Congress enacted the Federal Employers' Liability
Interstate Commerce: Congressional Statute: State Statute Superseded.
Act, it in effect, *ipso jure,* absolutely repealed or wiped from the books all statutes of the various States regarding all subjects of interstate commerce covered by that act, principal among which are injuries done to the employees of interstate carriers.

In the case of Thompson v. Wabash Railroad Co., 262 Mo. 468, 1. c. 480, this court in considering this precise question quoted largely from various opinions delivered by the Supreme Court of the United States, as will appear from the following quotation taken therefrom:

"In construing the act of Congress mentioned, the Supreme Court of the United States, in the case of Michigan Central Railroad Company v. Vreeland, 227 U. S. 1. c. 66, said:

" 'We may not piece out this act of Congress by resorting to the local statute of the State of procedure or that of the injury. The act is one which relates to the liability of railroad companies engaged in interstate commerce to their employees while engaged in such commerce. The power of Congress to deal with the subject comes from its power to regulate commerce between the States. [Simon v. Southern Ry. Co., 236 U. S. 115, 1. c. 123.]

" 'Prior to this act Congress had not deemed it expedient to legislate upon the subject, though its power was ample.

" ' "The subject," as observed by this court in Mondou v. Railroad, 223 U. S. 1, 54, "is one which falls within the police power of the State in the absence of

legislation by Congress." [N., C. & St. L. Ry. Co. v. Alabama, 128 U. S. 96, 99.] By this act Congress has undertaken to cover the subject of the liability of railroad companies to their employees injured while engaged in interstate commerce. This exertion of a power which is granted in express terms must supersede all legislation over the same subject by the States. Thus, in Gulf C. & S. F. R. R. Co. v. Hefley, 158 U. S. 98, 104, it was said in reference to State legislation touching freight rates upon interstate freight which conflicted with the legislation of Congress upon the same subject, that:

" ' "Generally it may be said in respect to laws of this character that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the State, is subordinate to those in terms conferred by the Constitution upon the nation. 'No urgency for its use can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution.' [Henderson v. Mayor of New York, 92 U. S. 259, 271.] 'Definitions of the police power must, however, be taken, subject to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land.' [New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 661.] 'While it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail.' [Morgan's S. S. Co. v. Louisiana Board of Health, 118 U. S. 455, 464.]"

" 'It therefore follows that in respect of State legislation prescribing the liability of such carriers for injuries to their employees while engaged in interstate commerce, this act is paramount and exclusive, and must remain so until Congress shall again remit the subject to the reserved police power of the States.' In the Second Employers' Liability Cases, 223 U. S. 1, the court said, 1. c. 46:

" 'The principal questions in these cases as discussed at the bar and in the briefs, are: 1. May Congress, in the exertion of its power over interstate commerce, regulate the relations of common carriers by railroad and their employees, while both are engaged in such commerce?    2. Has Congress exceeded its power in that regard by prescribing the regulations which are embodied in the act in question?    3. Do these regulations supersede the laws of the States in so far as the latter cover the same field?    4. May rights arising under those regulations be enforced, as of right, in the courts of the States, when their jurisdiction, as fixed by local laws, is adequate to the occasion?'

"Continuing on page 52 the court said regarding the question there:

" 'The third question, whether those regulations supersede the laws of the States in so far as the latter cover the same field, finds its answer in the following extracts from the opinion of Chief Justice MARSHALL in McCulloch v. Maryland, 4 Wheat. 316.'

"And on pages 54 and 55, the court said:

" 'True, prior to the present act the laws of the several States were regarded as determinative of the liability of employers engaged in interstate commerce for injuries received by their employees while engaged in such commerce. But that was because Congress, although empowered to regulate that subject, had not acted thereon, and because the subject is one which falls within the police power of the States in the ab-

sence of action by Congress. . . . The inaction of Congress, however, in nowise affected its power over the subject. . . . And now that Congress has acted, the laws of the States in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is.'

"In the opinion in McCulloch v. Maryland, referred to, 4 Wheat. 406, Mr. Justice MARSHALL said:

" 'The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the Constitution, form the supreme law of the land, "anything in the Constitution or laws of any State to the contrary notwithstanding." '

"Also in the case of Gulf Ry. Co. v. Hefley, 158 U. S. 98, the question being whether a statute of the State of Texas which was in conflict with the Interstate Commerce Act, had any force, the court said, l. c. 103:

" 'The question is not whether, in any particular case, operation may be given to both statutes, but whether their enforcement may expose a party to a conflict of duties. It is enough that the two statutes operating upon the same subject-matter prescribe different rules. In such case one must yield, and that one is the State law.'

"Continuing on page 104, the court further said:

" 'Generally it may be said in respect to laws of this character, that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the State, is subordinate to those in terms conferred by the Constitution upon the nation.'

"In the case of Adams Express Co. v. Croninger, 226 U. S. 491, the question was whether or not a contract between plaintiff in error and defendant in error, the plaintiff below, limiting the shipper's recovery to

an agreed value, was invalid. The local law of the State was that such contract was invalid, and the shipper was entitled to recover the actual value. The shipment was an interstate shipment. The court held that the Act of Congress of June 29, 1906, controlled, saying, page 500:

" 'But it is equally well settled that until Congress has legislated upon the subject, the liability of such a carrier, exercising its calling within a particular State, although engaged in the business of interstate commerce, for loss or damage to such property, may be regulated by the law of the State. Such regulations would fall within that large class of regulations which it is competent for a State to make in the absence of legislation by Congress, growing out of the territorial jurisdiction of the State over such carriers and its duty and power to safeguard the general public against acts of misfeasance and non-feasance committed within its limits, although interstate commerce may be indirectly affected.'

"Mr. Justice LURTON, quoting, on page 505, said:

" " 'The Congressional action has made an end to this diversity for the national law is paramount and supersedes all State laws as to the rights and liability and exemptions created by such transactions. This was doubtless the purpose of the law; and this purpose will be effectuated, and not impaired or destroyed by the State Court's obeying and enforcing the provisions of the Federal statute where applicable to the fact in such cases as shall come before them.'

"On the same page he further said:

" 'Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all State regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the State upon the subject of such contracts. But when Congress acted in

such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the State ceased to exist.'

"In the case of the State of Missouri v. Wabash Railroad Co., 238 Mo. 21, the defendant was proceeded against for a violation of sections 7818 and 7819, Revised Statutes 1909, regarding the hours of labor of railroad trainmen. The violation occurred in February, 1907. The evidence showed that the conductor who violated the statute was engaged in interstate commerce. There this court held that the same subjects were covered by the Act of Congress of March 4, 1907, regarding the hours of labor, and therefore our statutes on the same subject were abrogated. The language of this court was as follows:

" 'Consequently, in the case at bar, we are compelled to hold that, since the Act of Congress before mentioned covers the same subjects or classes of legislation that are covered by the Act of the Legislature of 1905, the former nullifies the latter as completely as if it had never been enacted.'

"And in Rich v. St. L. & S. F. R. R. Co., 166 Mo. App. 379, is a case exactly in point. There the widow of decedent sued under the State law. Defendant set up in its answer that the plaintiff could not maintain the suit because it arose under the Federal Employers' Liability Act, alleging the facts. On motion, the court struck out these allegations of the answer. The court speaking through NORTONI, J., said, l. c. 389:

" " "And now that Congress has acted, the laws of the States, in so far as they cover the same field, are superseded, for necessarily that which is not supreme must yield to that which is." ' This last quotation was from Smith v. Alabama, 124 U. S. 465.

"On page 390 the court said:

" 'It is, therefore, obvious that, though plaintiff did not declare upon the Employers' Liability Act, she nevertheless may not maintain this suit under our stat-

ute, for the right of recovery is given by the authority of Congress to the personal representative of her husband for the benefit of herself and his children. The court erred in striking out the portion of the answer above mentioned and in denying defendant the right to show the facts therein set forth.' "

This court has upon two previous occasions been called upon to consider what effect the enactment of the Federal Employers' Liability Act had upon similar State statutes covering the same subject-matters, and upon each of those occasions this court followed the pronouncements of the Supreme Court of the United States, and by unanimous opinions held our statutes upon the subject had been absolutely wiped from existence, as completely so as if they had never been enacted or had been repealed by the Legislature of this State. [State v. Missouri Pacific Ry. Co., 212 Mo. 658; State ex rel. v. Wabash R. R. Co., supra.]

From these observations it must be perfectly clear to all that the petition stated no cause of action, under section 5425, Revised Statutes 1909, of this State, the one under which the petition shows it was brought, for the obvious reason that in so far as this class of cases is concerned, said statute was absolutely repealed or wiped out of existence by said act of Congress.

Under the familiar rule, that whenever the petition in a cause fails to state facts sufficient to constitute a cause of action under the law, that vice may be taken advantage of by demurrer or objection to the introduction of testimony or by any appropriate plea filed at any time in any and all courts in which the case may be pending and being heard.

This principle of law is so well settled it needs no citation of authorities to support it.

It might as well be contended, where a person is indicted for murder under a State statute, and he pleads not guilty, and after the evidence has all been introduced he should ask for a discharge because the

statute had been previously repealed, that he has waived the right to insist upon the repeal; but if not, then insists that there is a statute of the United States in force which does cover the case, and therefore he should be convicted under the former, if waived, and under the latter if not waived. Such a position would be unsound, illogical and illegal.

For the reasons stated the trial court erred in refusing appellant's instructions in the nature of demurrers to plaintiff's evidence, and also to all of the evidence in the case.

This brings us to the consideration of the second reason assigned by counsel for respondent in support of their contention, that the appellant **Waiver:** waived its right to insist upon the fact **Conduct** **at Trial.** that the respondent could not recover in this case because counsel for the latter had tried the case as having been properly brought and prosecuted under the State statute, and therefore should not be permitted to urge the fact that it should have been brought under the Federal Employers' Liability Act.

This contention is not tenable for several reasons:

First, for the reasons stated in subdivisions (a) and (b) of paragraph Two of this opinion.

Second. Because the act of Congress mentioned is a public act, and all courts must take judicial notice of its existence, as well as its repealing effect upon our statutes regarding this class of cases, and therefore it was not incumbent upon appellant to plead it.

Under the state of pleadings before mentioned the evidence introduced by both the respondent and appellant showing that the road of the latter was an interstate road and not an intrastate line was clearly admissible in evidence to contradict the charge in the petition that it was an intrastate road under the same rule that permitted the respondent to introduce evidence tending to show it was an intrastate road.

That is unquestionably true, for the reason it tended to disprove the charge in the petition that the road mentioned was an intrastate road and therefore the respondent was not entitled to a recovery under the proof in the case.

That being true, it can in no sense be logically contended that appellant thus exercising his legal rights was estopped or waived its right to insist that the cause should have been brought by respondent in her representative capacity under the United States Employers' Liability Act, and not in her individual capacity under the State Statute.

Third. Closely connected with the two previous matters considered under the second subdivision mentioned, is the plea of contributory negligence contained in the answer and the evidence introduced by appellant for the purpose of proving that plea.

This plea is not inconsistent with the act of Congress mentioned; nor does that act prohibit the introduction of evidence tending to prove that the employee was guilty of contributory negligence; but upon the contrary, the act expressly provides that contributory negligence may be shown, therefore must be alleged, not in bar, as under the State law, but in mitigation of the damages the plaintiff might otherwise be entitled to recover.

The answer in this case is substantially the same as was the one in the case of Thompson v. Wabash Railroad Co., supra, and similar in character to the answers which have been uniformly filed in such cases in the courts of this State and those of the Federal courts sitting in this State, for many years prior to the passage of said act of Congress.

Clearly it was not the design of that act to change the principles and forms of pleadings in this class of cases, especially where the cases are to be brought under that act in the State courts.

Our own rules of pleadings must govern in all such cases, in the same manner as in cases arising under our State laws. Congress has no authority to make such a change. The difference consists in the legal effect the State law attaches to contributory negligence and that which is attached thereto by the Federal act.

Under our statute, as before stated, contributory negligence is a complete bar to any recovery in such cases; while under the Federal act, it may be shown for the purpose of mitigating the damages claimed.

For the reasons stated we are clearly of the opinion the appellant did not by pleading contributory negligence in this case, nor by offering evidence in support thereof, waive its right to invoke the Federal Employers' Liability Act as a bar to respondent's right to a recovery in this case.

III. Counsel for respondent cite many cases in support of their contention of waiver, principally from the courts of several of the States, but none directly in point from the Supreme Court of the United States.

But from the view we have taken of this case, and which we must take of it in the very nature of the thing, no good whatever could or would flow from a consideration of them. This is perfectly apparent for the reason previously stated, namely, that even though appellant did waive its right to insist upon Employers' Liability Act, yet in so far as this class of cases is concerned, that act completely repealed or wiped from existence section 5425, Revised Statutes 1909, the statute under which this suit was brought and prosecuted, and thereby left no law whatever in force, authorizing a recovery upon the facts proven by undisputed evidence.

The only law in existence which authorizes the respondent to a recovery for the matters complained of is found in the Federal Employers' Liability Act before mentioned.

Entertaining these views we are of the opinion that the judgment should be reversed and the cause remanded to the circuit court with directions to dismiss the case; and it is so ordered. *Graves, P. J.,* concurs in separate opinion; *Blair, J.,* concurs in the result; *Bond, J.,* dissents.

GRAVES, P. J. (concurring).—This case presents interesting questions and questions that should be well weighed. This action is under our State statute, and is by the widow in her own right. At common law she had no cause of action. Her action is therefore fully statutory. She must stand or fall under the provisions of our statute, because the Federal statute does not undertake to give to her an individual right of action. In her individual capacity she could not sue under the Federal statute. Starting with the proposition that the right to sue at all is purely statutory, let us see what is the status of plaintiff. Under the State law a right of action (one not theretofore recognized by the common law) was given to the widow of the deceased, upon condition as to time of bringing suit as set out in such statute. This right of action was one given to her, personally, and not a right of action given to the representative of the estate of the deceased. The Federal statute also creates a cause of action not recognized at common law, but it gives the right of action to the representative of the estate, and not to the widow or children in their personal rights. It requires no strain of imagination to see that the two statutes give different rights of action. In the one, the right is in the widow or children personally, and the other it is in the representative of the estate. This point is vital in this case.

It is settled doctrine that where a statute of the Federal Government is passed to and does cover a given field, then the fact of its passage operates as a practical repeal of State statutes upon the same sub-

ject. The State law is nullified as to all persons falling within the purview of the Federal act. LAMM, J., in a separate concurring opinion in the case of Thompson v. Railroad, 262 Mo. l. c. 490, aptly says:

"That when the Congress of the United States, under its constitutional power of regulating interstate commerce, has occupied the field by its statute, the State damage act must give way, *pro tanto,* where the two overlap in remedy, is not to be questioned for a moment. However much the State bench and bar may revere the old landmarks of our statute on damages, they must be willing to see that statute yield when the paramount authority of the Federal Government once takes over any phase of the regulation of interstate commerce and the liability of carriers in that line of business, as it has done in this instance."

Prior to the Federal act involved in this case the widow of a person belonging to the class to which plaintiff's deceased husband belonged had a statutory right of action. It was a right of action created by a State statute. This, however, did not prevent the Federal Government from passing a statute covering the field of persons injured while engaged in interstate business. The Federal Government saw fit to assert itself in the matter, and when it spoke, the right of action for one dying from injuries received while engaged in interstate commerce was given to the representative of the estate, and not to the widow or children personally. This statute of the Federal Government placed persons engaged in interstate commerce into a class to themselves and created a right of action in case of death. As to persons falling within the class, this Federal law took the place of all State statutes dealing with the same subject-matter. As to this class of persons it *pro tanto* repealed the State statutes. Such State statutes became as ineffective, both as to rights and remedies, as they would have been had they been specifically repealed by the State.

As to persons engaged in interstate commerce this Federal statute left no State law as to who might recover damages, or as to what extent, or under what conditions they could recover. It fully obliterates the State law. The cause of action being purely statutory, the plaintiff in this case was left without a cause of action at all when the Federal law was passed. The Federal law fully covered the field of liability, so far as the class to which plaintiff's husband belonged. Under the State statute she was then left no cause of action at all. She averred facts sufficient to make a cause of action under the State statute, but upon this the proof failed. Had she averred the fact that defendant was an interstate carrier, then the petition would have been subject to demurrer, and that being waived, there might have been a question of waiver in the case. We do not pass upon this question, however, because it is not a live issue here.

It is sufficient to say that plaintiff planted her cause of action upon a State statute, which as to her had been repealed by the Federal statute. The general denial interposed by defendant was sufficient to raise all questions of vitality here. Her petition averred a right of action under the State statute. The answer denied all the averments of the petition. When the Federal law dethroned her right of action as an individual, there was in fact no subject-matter to which jurisdiction could attach. Her individual right to sue had been repealed. The general denial raised the issue, and because the court forced a trial after objection made, cannot bind defendant either by waiver or otherwise.

It is unnecessary to try to review the cases from the United States Supreme Court. They are binding here, and we cannot distinguish this case from those cited in the majority opinion. With these suggestions, I concur in the opinion.

*Woodson, J.,* concurs in these views.