J. B. CLEVINGER v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—109 S. W. (2d) 369.

Division One, October 20, 1937.*

---

*NOTE: Opinion filed at May Term, 1937, June 30, 1937; motion for rehearing filed; motion overruled June 30, 1937; motion to transfer to Court en Banc filed; motion overruled at September Term, October 20, 1937.

*Joseph W. Jamison, Henry S. Conrad, L. E. Durham, Hale Houts* and *I. M. Lee* for appellant.

*Cope & Hadsell, Cowgill & Popham* and *John F. Cook* for respondent.

HAYS, J.—By this action, brought under the Federal Employers' Liability Act (45 U. S. C. A., Sec. 51), the respondent seeks to recover damages for personal injury received by him on June 29, 1931, while employed by the appellant as a section hand, at a point near Ritchey, Missouri. The work in which the respondent was engaged at the time was being performed on appellant's main line of railway, operated between St. Louis and Oklahoma City, over which appellant daily operated between those points trains of cars in carrying on both interstate and intrastate commerce. Respondent recovered a verdict and judgment for $25,000. The defendant has appealed. The principal errors assigned are in the denial of appellant's final demurrer to the evidence and in excessiveness of verdict.

Respondent's petition alleged that when he received his injury he and the appellant, in the performance of the work in question, were engaged in interstate commerce and transportation and in the furtherance thereof. Respondent's principal instruction required the jury to find that respondent was "engaged in work incident to the physical maintenance of main line tracks over which defendant operated interstate trains" and that "plaintiff and defendant were at said time engaged in interstate commerce."

The respondent, who lived at Ritchey, had at times previous during a period of some eight years, worked for appellant as a section hand. On said day (and a portion of the day before, it seems) he was working as an extra with English, a regularly employed section man, and under the supervision and direction of Hillerby, their foreman. Respondent's petition alleged that on said day respondent and English were engaged in cutting weeds on said main line right-of-way and removing ties found in ditches alongside the right-of-way; "that it became necessary to remove a new creosoted tie from along said ditch and while respondent and English were carrying the tie to the shoulder of the right-of-way, the tie was suddenly and negligently dropped by English without signal or warning, jerking the same out of respondent's hands, causing it to fall and strike

another creosoted tie there on the ground, with the direct result that creosote was splashed in his eye, whereby he was permanently injured.

The petition also pleaded a long-established practice and rule of appellant to warn in such case. (This practice or rule was not seriously disputed in the trial.)

The answer contained a general denial; also special plea "that if plaintiff was injured" at the time and place alleged, "such injury, if any" was caused by a risk which plaintiff assumed.

The reply was a general denial.

As the farthest reaching assignment of error involves the contention that respondent was not engaged in interstate commerce within the meaning of the Federal Act referred to, we take this assignment first, after prefacing our consideration of it with a somewhat detailed statement of the testimony relating to it.

According to respondent's version of the facts leading up to the casualty, on the day in question he and English were engaged in cutting weeds and clearing off the shoulder of the right-of-way and moving ties out of the right-of-way, "cutting" and moving them and taking them back along the track. These ties were heavily covered with creosote. "They had been unloaded off the car and rolled off in the water ditch and the order was to keep them carried out, and we were carrying them out of the ditch and up on the shoulder and rotating them along the shoulder. (He explained "rotating" to mean placing the ties end to end, parallel with the tracks) . . . the ties had liquid creosote on them and running off; this had killed the grass they were lying in. The shoulder is the side of the railway embankment leading out from the ballast. There were so many (8 or 10) of these ties rolled off that we carried them out and rotated them along the track. This was the last tie in the ditch that we were carrying. We had rotated them and we came up to the dump, and carried up on and going up to the side of this tie that was laying there. I was behind and looking and listening for him to give the warning. He was head man. When he got up within a couple of feet of the place—I lacked two or three feet of being there—he just pitched this tie without any warning or signal . . . I was looking at him. . . . It pulled me down when he pitched the tie. It landed on the end of the other tie that was laying there and creosote got in my eye, from one or the other of those two ties." No one saw the occurrence; it was just at quitting time (five o'clock) and in a brief time the foreman, who was down the track some seventy-five yards distant, signaled to them to come in. Respondent testified they were not cutting weeds in the ditch where the ties lay, but on the shoulder; they had not cut weeds at the place where they were putting the ties, which was right along the edge of the ballast.

The respondent in the course of this testimony was asked by his counsel whether the work he was doing at the time he received his injury was "part of the physical maintenance of appellant's railway system" and he answered, "yes." Being asked what was the purpose of removing the ties referred to, he answered—without objection being interposed by appellant's counsel to either of said questions— "Well, that creek overflows and comes down on this side of the track and washes these ties and they drift up against the culvert and the drain that goes under the railroad and causes the track to wash out, and the removal of the ties in that manner was necessary for the physical maintenance of these interstate tracks, . . . that there existed strict orders for section men to keep the ties carried out of the ditch and up on the shoulder."

It was not shown in the evidence when or by whom these ties which were moved on the day in question had been unloaded. Respondent, in his testimony evinced no knowledge on that subject. He was asked but did not remember whether he had helped to unload them and he did not know when they were unloaded. It does not appear in the evidence that any of the new ties were put into the track, or when they were purposed to be so used, or that each—or the tie in question—was put at a particular "spot." The evidence merely shows that all of them were "rotated" in a continuous line and no need for the use of any at any particular point was shown. Neither was there any evidence touching the previous shipping or movement of the tie in question before it was unloaded on the right-of-way, or of any of them.

Nor did the appellant's witness English or the foreman, Hillerby, aid respondent's case on the issue of "work in furtherance of interstate commerce." English corroborated respondent as to the work done that day, while contradicting him with respect to some details not important to this question. The foreman, without contradiction gave the further details of the work performed on that day. He said that the crew was engaged in "spotting track and cleaning grass from the chat" (ballast?), and explained that by "spotting track" he meant raising the low spots in the rails. He said they also moved ties up on the shoulder that were down the embankment; that such was the kind of work that he and the (regular) crew did all through that June; that respondent worked under him just a day (June 29) and a half day (doubtless June 28) and not afterwards. We find nothing further in the evidence respecting this issue.

Under the facts as stated, Was the respondent at the time of his injury engaged in interstate commerce within the meaning of the Federal Act? We are of opinion he was not, in view of the test laid down by the United States Supreme Court, and necessarily followed by our court, viz.: "The true test of employment in such commerce in the sense intended is, Was the employee at the time of the injury,

engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?'' [Shanks v. Delaware, L. & W. Railroad Co., 239 U. S. 556, 36 Sup. Ct. 188, 189, 60 L. Ed. 436, L. R. A. 1916C, 797, reaffirmed in Chicago & N. W. Ry. Co. v. Bolle, 284 U. S. 74, 52 Sup. Ct. 61, 76 L. Ed. 173; Chicago, B. & Q. Railroad Co. v. Harrington, 241 U. S. 177, 60 L. Ed. 941, affirmed in Chicago & E. I. Railroad Co. v. Industrial Comm. of Ill., 284 U. S. 296, which also definitely overruled Erie Railroad Co. v. Collins, 253 U. S. 77, and Erie Railroad Co. v. Szary, 253 U. S. 86.]

Respondent claims that his case comes under the second branch of this rule. He relies upon Pedersen v. Delaware L. & W. Railroad Co., 229 U. S. 146, 33 Sup Ct. 648—the leading case of its class—in which the determinative fact was that the injured employee there was carrying materials for immediate use in the repair of a bridge on an interstate railroad. The plaintiff was an iron worker employed by the railroad in the alteration and repair of some of its bridge and tracks. The plaintiff, at the time of his injury, and another employee, under the direction of their foreman, were carrying from a tool car to a bridge (named) some bolts and rivets which were to be used by them that night or very early the next morning in repairing that bridge, the repair to consist in taking out an existing girder and inserting a new one. The bridge was regularly used, in both interstate and intrastate traffic. The court substantially held that the keeping of the bridge in a proper state of repair while used in interstate commerce was so closely related to such commerce as to be in practice and in legal contemplation a part of it; that it was necessary to the repair of the bridge that the materials be at hand, and the act of taking them there was a part of that work— a minor task essentially a part of a larger one.

Respecting the facts there in judgment it is apparent that the particular repairs had been determined upon; they were also imminent; the injury was received in the physical preparation then being made by the employee in carrying necessary materials for his immediate use in the making of the repairs on *that* bridge. It was a task essential to the larger one; not, we wish to emphasize, a mere *casually* connected one. It seems a far cry from that factual situation to the situation presented in the instant case.

In the present case the respondent's performance of the act did not directly and immediately tend to facilitate the movement of interstate commerce, nor would his failure to perform it have directly or immediately deterred the movement of such commerce. No purpose to install new ties in the track for a then present need or an imminent future use for installing the ties in the track was shown, nor that this movement of the ties was anything more than a mere change in their place of storage. At most their placement on the

shoulder of the embankment did not definitely indicate where the ties should be used in appellant's track nor when, but constituted a storing until future need to use them in the track there or elsewhere when need should arise. Not shown to have before possessed the character of interstate commerce, the ties by being so moved and deposited acquire no such character. A purpose to devote in future an agency capable of use in interstate commerce to that service will not meet the conditions of the Federal Act, though physical preparation for immediate use in such commerce (as in the Pedersen case) will suffice to invoke the provision of the statute. [Buynofski v. Lehigh Valley Railroad Co., 228 N. Y. 249, 126 N. E. 714.] Respondent's duty ended when he had placed the tie on the shoulder. He had nothing to do with any specific use which might be made of it thereafter. [Chicago & N. W. Ry. Co. v. Bolle, 247 U. S. 74, l. c. 80.] In other words, the question is determined by the nature of the work at the time of the injury. [C. B. & Q. Railroad Co. v. Harrington, supra; Sailor v. Mo. Pac. Ry. Co., 332 Mo. 396, 399-400, 18 S. W. (2d) 82, and Aldridge v. Wabash Ry. Co., 335 Mo. 588, 597, 73 S. W. (2d) 401.]

The proposition that under the facts of the case at bar the respondent was not at the time of his injury engaged in interstate transportation, or ''in work so closely related to it as to be practically a part of it'' may properly be ruled upon the authority of the three decisions last above cited.

In the Harrington case, the employee was injured while moving coal to a shed where it was to be placed in chutes for delivery to interstate and intrastate locomotives. The court said that all that was involved was putting coal in a convenient place so that it could be taken as required for use.

The Sailor case involved an injury to a section man sustained in throwing creosoted ties from a car at the usual place on the next day after arrival, to be taken at some future time when needed, by a push car to places along the section, and used in replacing and renewing defective ties. This court held that the employee's act was not, in point of time, place and intent, so directly connected with interstate commerce as to constitute an integral part of interstate transportation. That case distinguishes the Pedersen case and for supporting authority rests upon the Harrington case, supra; (Fenstermacher v. Chicago, R. I. & P. Railroad Co., 309 Mo. 475, 274 S. W. 718); and upon decisions from other jurisdictions of the class of which the Harrington case is the prototype. [See, also, the later case of De Santis v. New York, N. H. & H. Railroad Co., 74 Fed. (2d) 261.]

It seems entirely clear that respondent and his coworker were following the general rule, practice and strict standing orders pertaining to ties that, in being unloaded from the car, had rolled down

the embankment; that was, to place them on the shoulder alongside the ballast in regular order and conveniently at hand for future use. Such was the dominant purpose in the removal of the ties, and the only purpose, as indicated by the standing orders. The possibility, voluntarily presented by respondent, of prevention of stoppage of a culvert by removal of the ties to the shoulder was purely casual to the main purpose and not shown to have been within the contemplation of the respondent's superiors in the railroad's service. It was shown to be within the general orders and practice to keep ties out of the water ditch all along the line irrespective of culverts. The proximity of the culvert was wholly adventitious. Again, that matter was speculative, was not supported by evidentiary facts and was insufficient to constitute work so closely related to interstate transportation as to form a part of it. [Morrison v. C., M. & St. P. Ry. Co., 175 Pac. l. c. 326; Allen v. Railway, 331 Mo. 461, 53 S. W. (2d) 884; Dupuis v. Louisiana Ry., etc., Co. (La.), 99 So. 709, unloading piling at a bridge to be used at a point 600 feet away to divert the current of a creek to secure the bridge abutments; Chesapeake & Ohio Ry. Co. v. Rucker (Ky.), 54 S. W. (2d) 642.]

■ It is insisted that respondent tried the case in the court below on the theory that it was not material to show in the record that the work plaintiff was engaged in was closely connected with interstate transportation. This insistence is predicated in part upon the claim that appellant is here "skimming over the very 'issue' it now urges," and treating the issue as not material below asked and stated to its foreman on the stand: "Q. Now, what was the man engaged in doing generally through the month of June, 1931, while you were foreman at Ritchey? What was the nature of the work you were doing on the section? A. Spotting and cleaning grass from the chat. Q. What did you say? A. Spotting track and cleaning grass from the chat. Q. *I do not know that it is material. What do you mean by spotting track?* A. *Raising the low spots in the rails.*"

This testimony, it is contended, shows that plaintiff and the section gang all through the month of June had been repairing the roadbed, raising the low spots in the rails. If so, it is plain from the preceding discussion that such evidence raises no inference that new rails had been installed in the track in previous work of "spotting" or were to be installed following the work respondent did (it is shown supra he worked but a day and a half and in place of regular section man Ritter), or was in interstate commerce or work so closely connected therewith as to form a part of it. Nor was there anything misleading, or constituting a waiver, in appellant's counsel's attitude toward the incident quoted above or inconsistent with the position they take in this court.

It is also insisted that there can be no doubt that respondent was so engaged, as he "was charged with the duties of helping to keep in physical order and physically maintaining the tracks for the use of interstate trains." This because (1) it is obvious from the nature of his duties; (2) it was conceded by appellant in the incident above quoted and discussed; and (3) respondent so testified. Points (1) and (2) have been disposed of; the evidence upon which point (3) is based, we have set out at the close of our statement of respondent's testimony; but for convenience of reference we here set out the part pertinent to this contention: "Q. And what is the purpose of removing those ties? A. Well, that creek overflows and comes down in this side of the track and washes these ties and they drift up against the culvert, the drain that goes under the railroad, and causing the track to wash out. Q. So, would you say it was necessary for the physical maintenance of those interstate tracks for those ties to be removed in that manner? A. Yes, sir. Q. And were you engaged in that very kind of work at the time of this injury? A. Yes, sir. Q. And were you at that time obeying the instructions of your superiors over you? A. Yes, sir."

It has already been seen that a purpose, if any, of preventing the tie from clogging the culvert was casual to the main purpose of removing it for use, and the incidental purpose, if any, could not dominate and characterize the primary purpose. There was no evidence that the tie was in imminent danger of being washed away, or that it was or would have been at that time removed for any other purpose than that of deposit where respondent placed it.

This testimony now under consideration cannot be treated as expert. Obviously, it is not within the field of expert testimony. So, respondent's citations of authorities on testimony of experts do not apply. So, too, in regard to the rule as to parties trying or submitting their case on the same theory. These parties did not do that. Nor did said testimony go to or consist of ultimate facts, as claimed. On the contrary, it was a mere statement of respondent's conclusions, necessarily controlled by the facts given in his testimony and of no greater weight. [Crossno v. Terminal Railroad Assn., 328 Mo. 826, 834, 836, 41 S. W. (2d) 796; Ingram v. Railroad, 326 Mo. 163, 173, 30 S. W. (2d) 989; Pennsylvania Railroad v. Chamberlain, 288 U. S. 333; Gulf, M. & N. Railroad Co. v. Wells, 275 U. S. 455, 458.]

Neither the evidence proper nor respondent's conclusions went farther than to show that respondent's service was helpful and might become necessary in maintaining interstate transportation—as, e. g., in the Harrington case—but evidently did not show, or raise any fair inference, that the work he was doing at the time was so closely related to interstate transportation as to be practically a part of it.

Respondent complains, substantially, that additional facts, bearing upon this vital question were within appellant's knowledge and it was appellant's duty to bring them forth. This overlooks the elementary rule that the burden rested upon respondent to make a prima facie case and that appellant was under no duty to aid him in that behalf.

In the view we have taken of the case, it is unnecessary to review other assignments of error.

The judgment is accordingly reversed. All concur, except *Douglas, J.*, not voting because not a member of the court when cause was submitted.