J. P. GRAY v. JAMES M. KURN and JOHN G. LONSDALE, Trustees of St. Louis-San Francisco Railway Company, a Corporation, Appellants.—137 S. W. (2d) 558.

Division One, March 6, 1940.

1028

*J. W. Jamison* and *Mann, Mann & Miller* for appellants.

*Jo B. Gardner* for respondent.

DALTON, C.—This is an action for damages for personal injuries sustained by plaintiff. Suit was brought under the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59) and a judgment for $10,000 recovered. Motion for a new trial was filed and overruled, and defendants appealed.

Appellants assign error on the action of the trial court "in refusing to give defendants' requested instruction, in the nature of a demurrer, at the close of all the evidence in the case." The particular grounds are (1) that respondent, when injured, was not engaged in interstate transportation and, therefore, has no cause of action under the Federal Employers' Liability Act, and (2) that respondent failed to prove actionable negligence on the part of appellants. We shall refer to the parties as plaintiff and defendants.

In view of the assignment of error we must review the facts in evidence. We shall give consideration only to that evidence which is most favorable to plaintiff on the particular issues of this appeal. [Montague v. M. & K. I. Ry. Co., 305 Mo. 269, 264 S. W. 813, 815.] Defendants' evidence will be disregarded except in so far as it aids the plaintiff's case. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, 953; Armstrong v. Mobile & Ohio Ry. Co., 331 Mo. 1224, 55 S. W. (2d) 460, 462.] We shall first determnie whether a submissible case was made for plaintiff under the federal act.

Plaintiff was employed by defendants as a section foreman. His section covered the first 9½ miles of the main line track south of the switch yards at Monett, Missouri. It was plaintiff's duty to keep his part of the track in good condition for the operation of trains. The main line extended southward from Monett to Fort Smith, Arkansas, and thence into Oklahoma and Texas.

On the day in question the plaintiff, at the direction of the acting roadmaster, met a work train at Monett with his men for the purpose of unloading ties. One Davis, foreman of the first section south of plaintiff's section, also met the train with his men. They were to go south from Monett and unload ties all day. The train left Monett about 8 A. M. with 26 cars loaded with railroad ties. The ties on the first four cars immediately back of the engine were to be unloaded along plaintiff's section, and thereafter the ties in the other cars were to be unloaded along other sections to the south. The train had no particular destination or schedule for the day, but was to move forward slowly so that ties could be unloaded from the cars along the various sections of the main line in accordance with the need for ties. The train reached Rodgers, Arkansas, about 5 P. M. and Fayette Junction, two miles below Fayetteville, Arkansas, that night. It does not appear definitely from the evidence that all of the 26 cars of ties were unloaded, nor when they were unloaded. One witness testified, "we were unloading ties all the way," another said ties were unloaded from this train from Monett, Missouri to Lowell, Arkansas, and that some ties were unloaded the next day at Winslow, Arkansas, but that additional cars of ties were picked up at Fayetteville or at the junction two miles south. Each section along the line received its allotment of ties before the train proceeded.

In accordance with the custom of defendants, the plaintiff, as foreman of the first section, rode the engine with the engineer while the train was on plaintiff's section. All of the section men and foreman Davis rode in the first four cars and unloaded ties as the train moved southward. The plaintiff rode the engine while the work train was on his section to control the speed of the train, slowing it down where more ties were needed and speeding it up at places where fewer ties were needed.

When the train reached a point just beyond the south end of plaintiff's section it was stopped. Plaintiff left the engine and went back to see if all ties assigned to his section were unloaded, and had the few remaining ties, perhaps twenty-five, unloaded at that point. These ties were later moved back to plaintiff's section.

When the ties for plaintiff's section were unloaded, it was plaintiff's duty to assist the men in unloading ties from other cars over the next section while Davis, the foreman of that section, rode with the engineer. While the train was stopped, plaintiff, in accordance with his duty, made a record of the initials and numbers of the cars

from which the ties for his section had been unloaded. The section men, after unloading the four cars, went back to open other cars which were to be unloaded on the next section. Davis took plaintiff's place on the engine and plaintiff went to assist in unloading ties. Before these cars were fully opened, and while plaintiff was still on the ground, the train started and plaintiff climbed on the ladder of one of the cars. While riding in this position plaintiff was injured by a door which fell from a car ahead of him and leaned back toward the train, striking and injuring him. We shall deal presently with the particular facts attending his injury.

A total of approximately 1200 ties were unloaded along plaintiff's section. This was about a year's supply. Plaintiff had on hand 132 ties for use and they were scattered along the line but not necessarily where they were needed. The number of new ties to be used in repairing the main line was regulated ordinarily by a monthly allowance fixed by the roadmaster. This allowance controlled, except in cases of emergency. Plaintiff's orders were to take out and replace all badly decayed ties in order to keep the track in a safe condition. Plaintiff testified that some of the ties unloaded were needed for immediate use in repairing the track and that he intended and expected to use these ties immediately.

After the new ties were scattered along the main line it was immaterial whether new ties, or old ones already on hand, were used. The foreman could use whatever ties were handy or he saw fit to use and there were no instructions as to the particular ties to be used. There were many places where ties were needed and where these new ties were dropped. In replacing broken or rotten ties plaintiff intended to use the ties that were handiest to the places from which the old ties were removed. The section foreman who succeeded plaintiff on his section used some 40 to 50 ties in the 10 or 12 days immediately following plaintiff's injuries. The ties used were those that happened to be closest to where they were needed. There was no way to tell whether the ties used were new ones just unloaded or the ones previously on hand.

Appellants' position is that whether or not plaintiff was engaged in interstate transportation must depend upon the particular work in which he was engaged at the very time of his injury; that there was no evidence that it was determined at or prior to the time that plaintiff was injured that the train would in fact proceed into the State of Arkansas, or that it would travel any certain distance on that day; that the ties were being unloaded "in order to be available if, when, and as needed," and were merely surplus ties; that the character of the commerce in which plaintiff was engaged must be determined not only by the particular work, but from the primary or main purpose to be accomplished by his work; that the primary purpose of plaintiff's work was not to assist in the transportation of

persons and things in commerce, but merely to unload materials along the tracks for future use; and that the progress of the train along the main line without a fixed schedule was merely incidental to the primary purpose of unloading local materials for future use. Appellants insist that this is a "surplus supply" case and is governed by Sailor v. Mo. Pac. Railroad Co., 322 Mo. 396, 18 S. W. (2d) 82, 84, and Aldridge v. Wabash Ry. Co., 335 Mo. 588, 73 S. W. (2d) 401, 404; and that since the primary purpose of the work was local in character rather than interstate, the case is controlled by such cases as Clevinger v. St. Louis & S. F. Ry. Co., 341 Mo. 797, 109 S. W. (2d) 369, 371; Chesapeake & O. Ry. Co. v. Rucker, 246 Ky. 161, 54 S. W. (2d) 642, 646.

We think it is apparent that there was sufficient evidence from which the jury could find that, at the time plaintiff received his injuries, he was acting in the capacity of a member of the crew of an interstate train, which train was moving along the main line of defendants' railroad between Monett, Missouri, and Lowell, Arkansas; and that some of the cars and ties were then being transported to another state in interstate commerce. Even if it be considered that the primary purpose of the operation of this train was to unload company materials along its own right-of-way for future use, still there was evidence from which the jury could find that the movement of the train was an interstate operation for the direct purpose of distributing ties, not only along the right-of-way in Missouri, but also along the right-of-way in the State of Arkansas, and that plaintiff's presence upon and about said train was directly in aid of said interstate transportation. It cannot be said that the purpose to distribute ties along the right-of-way in the State of Arkansas was inferior to the purpose to distribute ties along the right-of-way in this State. The train and its crew were engaged in interstate transportation from the time the train left Monett. Plaintiff was engaged in assisting in the management, control and movement of an interstate train. It is immaterial that plaintiff, at the particular time of receiving his injuries was changing from one type of work to another. He was still acting as a member of the crew of an interstate train and the change from one type of work to another was merely incidental to his employment in the furtherance of the movement of the train.

There was evidence that it was necessary for the ties destined for the respective sections on that portion of the main line track in Missouri to be unloaded before this train could proceed upon its interstate journey, and transport the cars and remaining ties farther down the line and into the State of Arkansas. Plaintiff had just finished directing the speed of this particular train over his section and was going back to assist in unloading ties over the next sections. Each section was to get its ties before the train moved on. The train was to proceed south all day unloading ties. Ties were in fact un-

loaded all the way to Rodgers and Lowell, Arkansas, and the train continued on to Fayette Junction, that night. There was no evidence of any change of plan·or schedule after plaintiff was injured. It is immaterial that plaintiff, by reason of his injuries, did not continue his work into another State. At the time plaintiff was injured the train was moving on the main line of defendants' railroad on an interstate journey to the State of Arkansas where in fact it arrived on the same day.

It has been held that the hauling of empty cars from one State to another is interstate commerce. [North Carolina Railroad Co. v. Zachary, 232 U. S. 259, 260, 34 Sup. Ct. 305, 58 L. Ed. 59; Thompson v. Wabash Ry. Co., 262 Mo. 468, 171 S. W. 364.] The same is true of the movement of disabled engines from one State to another. [Chicago, R. I. & P. Ry. Co., v. Wright, 239 U. S. 548, 36 Sup. Ct. 185, 60 L. Ed. 431; Kepner v. Cleveland, C., C. & St. L. Ry. Co., 322 Mo. 299, 15 S. W. (2d) 825, 828.] The removal of defendants' own materials from one State to another was as much interstate transportation as the movement of revenue freight. [Jonas v. Mo. Pac. Ry. Co. (M. App.), 48 S. W. (2d) 123, 124, certiorari denied. Mo. Pac. Ry. Co. v. Jonas, 287 U. S. 610, 77 L. Ed. 530; Swain v. Terminal Railroad Assn., 220 Mo. App. 1088, 291 S. W. 166, 169, certiorari denied, 48 Sup. Ct. 18, 275 U. S. 525, 72 L. Ed. 406; Aldridge v. Wabash Ry. Co., 335 Mo. 588, 73 S. W. (2d) 401, 402.] We, therefore, hold that there was ample evidence in the record to submit to the jury the proposition as to whether or not, at the time of receiving his injuries, plainiff was engaged in interstate transportation or in work so closely connected therewith as to be a part thereof and in accordance with the allegations in the petition. [McNatt v. Wabash Ry. Co., 341 Mo. 516, 108 S. W. (2d) 33, 40; Rogers v. Mobile & Ohio Railroad Co., 337 Mo. 140, 85 S. W. (2d) 581, 584; Gieseking v. Litchfield & M. Ry. Co., 339 Mo. 1, 94 S. W. (2d) 375, 379; Howard v. Mobile & O. Railroad Co., 335 Mo. 295, 73 S. W. (2d) 272, 275.]

It is unnecessary to determine whether the evidence was also sufficient to make a submissible case under the pleadings and the Federal act on the theory that some of the ties were needed for immediate use in repairing the main line track and were being unloaded where needed with the present intent to use them immediately in making necessary repairs. [Pedersen v. Del. L. & W. Ry. Co., 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153; Kansas City Southern Ry. Co. v. Martin, 262 Fed. 241, 242; Sweany, v. Wabash Ry. Co., 229 Mo. App. 393, 80 S. W. (2d) 216, 219.]

The petition charged (1) negligence in permitting the car and car door, referred to above, to be defective and unsafe so that the door was likely to fall; (2) negligence of the workmen exerting excess force against the door in trying to open it and therefore causing it to fall; and (3) negligence in starting the train, contrary to custom and

practice, before plaintiff boarded it and without giving him time to get on. Plaintiff alleged that the said negligent acts of the defendants' servants, acting separately or concurrently, caused plaintiff's injuries. The answer, in addition to a general denial, contained a plea of assumption of risk and contributory negligence. Plaintiff's instructions submitted only the first and third grounds of negligence referred to above, and submitted them in the conjunctive, to-wit: that defendants were negligent in starting the train while plaintiff was on the ground and without giving him an opportunity to get up on said train while same was standing *and* in permitting the car and car door to be defective and unsafe, in that the door track was loose and had too much slack, and that such negligence caused plaintiff's injuries.

The evidence tended to show that, after plaintiff left the engine, he took down the numbers of the cars which were unloaded on his section and supervised the removal of the few remaining ties from these cars; that he then went back in the direction of the section men who were attempting to open one of the next cars of ties. While plaintiff was walking back, the acting roadmaster gave the order for the train to start and the train started. There was testimony that, although the conductor was still in charge of the train, the roadmaster was in fact in charge of the unloading of the ties and therefore gave the order for the train to start. When the order was given the plaintiff and one other employee were still on the ground. Other employees were in the cars or were in the act of getting in and were attempting to open doors on cars. One employee was caught partly in and partly out of a car door until the door was opened from the inside. Someone called to plaintiff to get on and he caught the ladder near the end of the seventh car back from the engine. Another employee caught the ladder on another car. Plaintiff testified that it was against the rules to climb up on top of the cars because you were expected to get inside and assist the other men in unloading ties, but that he did not have time to finish his work and get in any of the cars before the train started. He caught the ladder while the train was moving 3 or 4 miles per hour and expected to climb on up to the top of the car. Plaintiff stood on the ladder with his left foot "in the stirrup over the journal" and with the other "up in the rack," and was holding to the grab irons with his hands. He heard an unusual noise, looked ahead, and saw that a door from the next car in front of him had fallen to the ground and was leaning back against the side of the car. It was within 10 feet of plaintiff, scraping along the side of the train and rolling with it. The door struck plaintiff about midway of the thigh on the left leg and knocked him from the train, breaking his leg and other wise injuring him. His left leg was later amputated about 5 inches below the hip joint. It is unnecessary to discuss the extent of his injuries,

since it is not contended that the verdict is excessive. The train traveled only the distance between 3 or 4 telegraph poles before plaintiff was injured. It had attained a speed of 5-10 miles per hour, but was stopped before the entire train had passed the place where plaintiff fell. Plaintiff was on the west side of the train and on the inside of a curve and at all times was in plain view of the engineer.

There was evidence that it was the custom and practice of the defendants, for the safety of the employees, not to start such a work train until all of the men were in the cars and set for work; that it was the custom to give the section men time to open the doors on the cars to be unloaded next, and for the foreman and the men to get in and get ready to unload ties before the train started. There was evidence that it was the custom to give the foreman, whose section had just been passed and who had been riding with the engineer, time to come back from the engine, check the cars unloaded, and to finish unloading the ties assigned to his section, as well as to get ready to assist in unloading ties over the next section, and to get on the train before the train should be permitted to start.

The evidence with reference to the car and car door tended to show that the door fell from a Frisco automobile car of the 145,000 series; that the car was loaded with railroad ties; that they were stacked crossways in the car, 3½ to 4 feet high, and within 6 inches of the door; that while the train was stopped the door was opened about 1½ feet, but could not be opened farther, nor could the men see why it would not open; that the roadmaster then directed the men to get in the car and open it up; that the doors on the opposite side of the car were opened and 3 or 4 men in the car were attempting to open this particular door when the train started; that while the train was getting under way two men were pushing the door straight back, along the side of the car and toward the engine, and another was pulling it; that all were holding within a foot or so of the top of the door, pushing it south and trying to get it open; that no one was pushing it out; that suddenly the door moved about ½ inch, dropped off, and fell straight down to the ground.

The door weighed about 300 pounds, was 9 feet high and 7 feet wide, constructed with a metal frame and was covered with 15/16 inch tongue and groove siding running up and down. The door extended from the floor of the car to a point just below the roof. It was the larger one of the two doors on the west side of the car and covered the south side of the 9 x 12 opening in the side of the car.

Near the top of the car and extending along the side of the car and above the doors was a 23 foot metal track. It extended on each side of the opening in the side of the car so that the doors could slide back along the side of the car, with one door on each side of the opening. Its purpose was to guide the doors when they were moved away from the opening and to prevent them from falling out at the top, and not

to support the weight of the doors. This track on the side of the car is also referred to as a double angle iron or Z-bar. Looking at the bar from the end it appears that the upper edge is flat against the car and extends down, and then turns out, down and back toward the car, so that the lower edge forms a hook toward the car. Along the top of each of the doors is a similar double angle iron or Z-bar, but reversed, so that when looked at from the end it appears that the lower edge is fastened on the outside of the door near the top and extends up and in and over the top of the door, and then up and out, so that the upper edge forms a hook pointing away from the car. In this manner, the upper edge of the Z-bar on the door extends into the hook formed by the lower edge of the Z-bar on the car. In order to keep these two edges hooked further together so that the doors will not fall out or down, a board or side plate filler is attached to and extends along the side of the car and between the car and the door. With the Z-bars hooked together in this manner, and with the edge of one hooked inside the edge of the other, the doors may be moved back and forth along the side of the car and not come off or fall out at the top. Above and extending down from underneath the roof and about 3 inches over the Z-bar is a sheet metal water table intended to keep rain water from getting into the car doors and damaging the contents of the car.

Below the opening for the door, and extending in a straight line on each side, are a total of 11 rollers spaced about 20 inches apart. These rollers are level with each other and each roller is an independent unit. The rollers carry the weight of the doors. Each roller is about 4 inches in diameter and so constructed that the bottom of the door moves on the rim of the rollers, but each roller is a sufficient distance from the side of the car so that an angle iron which extends down and along the bottom of the door with a flange $7/8$ of an inch in width and $1/8$ inch in thickness can move between the outside rim of the rollers and the side of the car. This flange also runs on the rollers but not on the outside rim of the rollers. This flange prevents the bottom of the door from swinging out when the doors are open, closed, or being moved.

There was evidence that a short time after plaintiff was injured the car was inspected and it was found that 3 or 4 feet of the water table over the doors was missing; and that the track on the side of the car where the door fell was loose and showed a slackness of $1/2$ inch up and down, allowing a total movement of $1/2$ inch in the lower edge of this track or Z-bar. This looseness extended entirely across the opening for the door that fell and the extension used for opening it. The looseness was discoverable by inspection, to-wit, by merely taking hold of the track where the part of the water table was missing. It was found, also, that the roller near the lower outside corner of the opening from which the door fell, had at some

time, been bent down so that it was ¾ of an inch lower than the other rollers, and so that the top of the roller was not more than ⅛ of an inch above the lower edge of the flange on the door.

At the time of this inspection the door that fell was rehung and it was found that, when rehung, it could be removed by only one method without taking off the stops on the side of the car or other equipment, and that was by putting a bar under the door and raising it up from the inside, and then pushing the bottom of the door out. In this way the flange would come over the rollers and the door would fall. In other words, if the door was raised up and pushed out at the bottom it would fall. There was other testimony that this type of door could be removed by forcing out the lower outside corner of the door so that the end of the bottom flange on the door would pass one of the rollers on the outside and then by moving the door to one side so that the bottom flange would pass the other rollers on the outside. Another method for removing a door was to remove the stops on the side of the car and then move the door along the side of the car and past the end of the track and rollers.

The evidence tended to show that the car in question was subsequently put on a rip track at Monett for repairs; that a rip track is a place for repairing defects in cars; that cars were not put on a rip track for light repairs, since such repairs are made in the yards; that the door track on this car was rebolted on each side of the car, a new door was made and hung, a brake beam was repaired, and a grab iron straightened on the same side of the car from which the door fell; that the track on each side of the car was fastened on with 18 bolts; that in removing the old bolts the tap ends were cut off on the inside of the car, the bolts driven out, and new ones put in from the outside; that bolts get rusty and are hard to unscrew, and therefore the tap ends are cut to remove them; that part of the bolts that were removed were loose; and that some of the nuts or taps were on and some were off.

There was evidence that worn or loose bolts would cause slack in the track; that, if a car and door were in good condition, the holes for the bolts were of the proper size, and the bolts tight, there would be no slack in the track; that if the track was in good condition and properly attached, the door could only be removed by taking the back stops off of the side of the car or by forcing the corner of a door outside and past the rollers; that bolts become loose by the lumber drying out and shrinking and from vibration; and that it is nothing unusual to have to rebolt such a door track on a car.

There was evidence to the effect that looseness in the track on the car to the extent that it had a play of ½ inch up and down, or a ½ inch of slack in the track, would cause the door to drop; that the track or Z-bar on the top of the door would drop out of the track or Z-bar on the car, if the track on the car was loose; that if the roller

referred to at the lower right hand corner of the door was ¾ of an inch lower than the other rollers, so that the flange on the bottom of the door would not properly extend down behind the rim of the roller, whenever you would start to open the door, the door would ''rare up on you,'' and the bottom would go out of the roller, and down, and the door would fall out, if you kept pushing it to the side to open it; that with a half inch slack in the track up and down, and with a low roller at the lower right hand corner of the door, if the door was opened 18 inches wide, and was being pushed farther open, the door would probably be pushed off and out through the low roller and drop out from under the track at the top, thus causing the door to fall; that this would be caused by the fact that the roller was so low that the door could not ride on it and the weight of the door would have to be carried by the track at the top; that it would be difficult to open the door at all, if there was no slack in the track, but if the track on the car was loose the door would not stay on at all. There was evidence that it was the duty of the car inspectors to go over the train and see that all of the cars were in good shape, and that all safety appliances and side doors were in good condition and that if a car was not in good shape to ''bad order'' it and put it on the rip track. Another witness testified that it was the practice to inspect cars and that it was the duty to inspect for everything in general, to see that the cars were in good running order. Defendants' evidence tended to show that the car in question was inspected before it left Monett on the day plaintiff was injured; that the inspection was made by walking the full length of the train and back on the other side; that no record was made of anything being wrong with any of the cars in this train; that the only inspection was made by looking at it—no tests being made, and that the inspector did not go on top of the train, as he didn't have time to do so on outbound trains. Defendants' witness conceded that it was his duty to inspect safety appliances, including running boards and grab irons on top of the cars, and anything else that might prove dangerous to trainmen or even to the traveling public in the operation of trains.

Appellants concede that ''the sole issue before this court on this appeal, is whether respondent made a submissible case for the jury,'' but promptly undertake to limit the application of that statement by saying that respondent is bound by the particular theory asserted at the trial in argument, and by the instructions on negligence and on interstate transportation; and that unless the evidence supports the verdict upon the basis of the particular instructions which were given, the judgment should be reversed.

Where a ruling on a demurrer to the evidence at the close of the whole case is the only issue presented on appeal, the question is whether the demurrer to the evidence was properly ruled at the time it was presented. At that time the plaintiff had not selected the par-

ticular theory under which the case would be submitted and no argument had been made or instructions given. A general demurrer to the evidence challenges the sufficiency of the evidence to make a submissible case for the jury on any theory of liability alleged in the petition. [Elkins v. St. Louis Public Service Co., 325 Mo. 951, 74 S. W. (2d) 600, 601.] Where several grounds of negligence are pleaded, and evidence is offered in support of each, a general demurrer is properly refused if a case is made for the jury on any one of the grounds alleged. If plaintiff in such case thereafter by instructions submits the cause to the jury upon a theory pleaded, but not supported by sufficient evidence, defendant does not preserve such point for review by merely saving exceptions to the court's action in ruling the demurrer and assigning error thereon.

Appellants insist that since the plaintiff submitted to the jury a combination of two acts of negligence, to-wit: (1) the negligent starting of the train before plaintiff had an opportunity to get on, and (2) the defective condition of the door and its fastenings, plaintiff should have made a submissible case for the jury on both of these acts of negligence in order to sustain the verdict and judgment.

The sufficiency of the evidence to sustain the verdict and judgment on the particular theory upon which the cause was submitted to the jury is not before us on this appeal. There is no assignment of error based thereon. [Mahmet v. American Radiator Co. (Mo.), 294 S. W. 1014, 1017; City of St. Louis v. Buselaki, 336 Mo. 693, 80 S. W. (2d) 853, 858.] Neither is such error, if any, preserved in the motion for a new trial. Appellants state that, prior to the time the court ruled on their motion for a new trial, they "in open court withdrew all grounds of their motion save and except the first and second," which charged error in refusing to give appellants' instructions in the nature of demurrers to the evidence at the close of plaintiff's case and at the close of all the evidence in the case. Objection that the evidence was insufficient to sustain the verdict on the particular theory upon which the cause was submitted to the jury should have been preserved in the motion for a new trial, if it was to be presented here. [Blakely v. Hannibal & St. Joseph Ry. Co., 79 Mo. 388, 389; Spotts v. Spotts, 331 Mo. 917, 55 S. W. (2d) 977, 981.]

Appellants insist that the plaintiff, to have made a submissible case for the jury, should have made a submissible case "as to each and both" acts of negligence submitted to the jury because plaintiff's injuries would not have resulted from either of the alleged acts of negligence without the concurrence of the other, and therefore, the negligence of defendants in both respects had to be established by the evidence. Appellants cite Bonnarens v. Lead Belt Railroad, 209 Mo. 65, 273 S. W. 1043, and Brainard v. Mo. Pac. Railroad Co., 319 Mo. 890, 5 S. W. (2d) 15. These cases were determined upon the basis of plaintiff's theory as pleaded in the petition and are not *applicable* to the facts here.

■ The general rule is "that if a defendant is negligent and his negligence combines with that of another, or with any other independent, intervening cause, he is liable although his negligence was not the sole negligence or the sole proximate cause, and although his negligence, without such other independent, intervening cause, would not have produced the injury." [Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 93 S. W. 951, 7 L. R. A. (N. S.) 293.]

The same rule applies where the concurring cause is another negligent act of the same defendant. "It is not the law that plaintiff may not go to the jury upon one negligent act of defendant shown to have proximately contributed to plaintiff's injury merely because some other negligent act of defendant also contributed to the injury and the plaintiff would not have been injured without the concurrence of such other act. We cannot subscribe to the doctrine that plaintiff is not entitled to recover for one negligent act of defendant proximately contributing to plaintiff's injury because the injury would not have resulted without the concurrence of another negligent act of defendant. The injured party may recover for any negligent act directly contributing to his injury, regardless of what other negligent act may contribute, concur, or co-operate to produce the injury." [Hild v. St. Louis Car Co. (Mo. App.), 259 S. W. 838, 841.]

If there was sufficient evidence to submit to the jury any theory of defendants' liability, as set forth in the petition, plaintiff was entitled to have that theory submitted to the jury, regardless of the fact that plaintiff's injuries would not have resulted except for the concurrence of some other negligent act on the part of the defendants.

■ Appellants insist that no liability can be based upon the starting of the train because plaintiff was not injured by the starting of the train; that the starting of the train was not the proximate cause of plaintiff's injuries; that no injury of any kind to plaintiff could reasonably have been anticipated at the time the train was started; that trainmen frequently ride the outside of the train without injury; that the falling of a door is so rare that a reasonably prudent person would not have anticipated that such would happen; and that negligence is not proved by such an isolated occurrence but must be predicated upon what should have been anticipated. [State ex rel. Lusk v. Ellison, 271 Mo. 463, 473, 196 S. W. 1088; Ilgenfritz v. Mo. Power & Light Co., 340 Mo. 648, 101 S. W. (2d)723, 727.]

In determining proximate cause the question is not whether a reasonably prudent person would have foreseen the particular injury which happened, but a defendant is liable for an injury which, after the occurrence is complete, appears to be the reasonable and probable consequence of defendant's act or omission. [Hamilton v. Standard Oil Co., 323 Mo. 531, 19 S. W. (2d) 679, 686.] In the case of Funk v. Fulton Iron Works Co., 311 Mo. 77, 277 S. W. 566, 570, the plaintiff

was injured by a metal ram which defendant's superintendent tossed to the floor. It was held that the defendant was liable if the superintendent knew or ought to have known that there was an appreciable chance that some injury to workmen engaged thereabout would result from his act. The court said: "Appellant contends that McLord in tossing the ram to the floor was not negligent because he could not anticipate that plaintiff would at the same instant extend his hand out beyond the lower edge of the juice pan. But in order for his act to have been a negligent one it was not necessary that he should have foreseen the particular consequences or the precise form of the injury which resulted from it. It is sufficient if under the circumstances he knew, or ought to have known, that there was an appreciable chance that some injury to workmen engaged thereabout would result." [See also, Daneschocky v. Sieban, 195 Mo. App. 470, 193 S. W. 966, 967.]

Under the evidence in this case a jury could well find that the agents and servants of defendants in charge of the train knew, or ought to have known, that some injury to employees might reasonably result from the starting of the train before the car doors were opened, and the men were on the train, and that under all of the circumstances the starting of the train, at the particular time, was due to a failure of defendants to exercise ordinary care for plaintiff's safety, and that said negligence directly contributed to plaintiff's injuries. Since there was evidence in this case from which a jury could find that plaintiff's injuries resulted from two concurrent causes for both of which the defendants were liable it was immaterial which one was the proximate cause of plaintiff's injuries.

"Where several causes producing an injury are concurrent and each is an efficient cause without which the injury would not have happened, the injury may be attributed to all or any of the causes, and recovery may be had against either or all of the responsible persons, although one of them was more culpable, and the duty owed by them to the injured person was not the same. Where the injury results from two or more causes for all of which defendant is liable, it is immaterial which was the proximate cause." [45 C. J. 924, sec. 487. Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S. W. (2d) 894, 900.]

In the case of Newcomb v. Railroad, 182 Mo. 687, 81 S. W. 1069, the plaintiff charged defendant with negligence in failing to direct him to his train and causing him to board the wrong train and also negligence in the maintenance of a platform upon which plaintiff slipped while getting off of the said train while in motion. Defendant contended, among other things, that its alleged negligence in failing to direct plaintiff to the proper train was not the proximate cause of his injuries. As to this point the court said (182 Mo. 687, 721, 81 S. W. 1069): "If the defendant's negligence was the cause

of plaintiff's getting on the wrong train and he was injured in trying to get off without any negligence on his part, the fact that the danger attendant upon his alighting was increased by the further negligent act of defendant in reference to the condition of the platform, would not relieve the defendant from liability for its first act of negligence on the ground that it was remote from the accident.

"In 1 Thompson on Negligence, section 69, it is said: 'The question of proximate cause does not arise in an action for personal injuries occasioned by an accident resulting from two or more causes, for all of which the defendant is responsible.' " [See also: Lewis v. Ill. Cent. Railroad Co., 319 Mo. 233, 239, 3 S. W. (2d) 371, 373; Evans v. General Explosives Co., 293 Mo. 364, 376, 239 S. W. 487, 491; Williams v. C., B. & Q. Ry. Co., 169 Mo. App. 468, 478, 155 S. W. 64.]

 Appellants insist that the plaintiff's theory of negligence, based upon defects in the car and door fastenings, is not supported by evidence but rests on conjecture; that proof of a condition does not prove a negligent cause (Wilson v. Mo. Pac. Railroad Co., 319 Mo. 308, 53 S. W. (2d) 19, 21); and that proof of a condition after the injury does not establish the existence of the condition before or that such condition had existed for any length of time. [Conduitt v. Trenton, Gas & Electric Co., 326 Mo. 133, 31 S. W. (2d) 21, 26.]

The facts and circumstances are such that a jury could properly infer that the defective condition of the car had existed for some time. None of the defects were of recent origin and there was no indication that the roller had been recently bent. A part of the water table was missing, and "not from this accident." The bolts in the track were exposed to the weather. It was necessary to cut off the tap ends of some of the bolts to remove them, indicating that they were rusty. Some of the bolts were loose, some taps were missing, and the track was loose. It was shown that it was not unusual for shrinkage and vibration to result in the track becoming loose and having to be rebolted. "An inference may be and often is retroactive, that is to say, the trier may from present conditions infer a previous fact." [Allen v. Chicago, R. I. & P. Ry. Co., 227 Mo. App. 468, 54 S. W. (2d) 787, 793; Conduitt v. Trenton Gas & Electric Co., supra; 22 C. J. 92, sec. 30.]

In the case of State v. Janes, 318 Mo. 525, 1 S. W. (2d) 137, 138, this court said: "While the presumption of the continued existence of a proven fact does not run backward, yet the surrounding circumstances may be such as to justify the inference that an established fact must have existed at a certain time in the immediate past." There was evidence from which the jury could find that the condition of the car, track and roller was such that the heavy door was likely to fall when being opened and that all defects were discoverable by inspection.

We hold that there was evidence in the record from which a jury

could infer that the defective condition of the car, as found to exist after the injury to plaintiff, had in fact existed for such a length of time previous thereto that the defendants by the exercise of ordinary care should, and could, have discovered such defects and repaired them. The jury, as triers of the fact, could reasonably and properly draw the inferences, from all of the evidence, in the case that, had defendants made a reasonable inspection of the car before it left Monett they would, or could, have discovered the defective condition of the car and door fastenings in time, by the exercise of ordinary care, to have repaired the same or "bad ordered" the car and thereby have prevented injury to plaintiff.

The demurrer to the evidence, as offered by defendants at the close of all of the evidence in the case, was properly overruled. The judgment is affirmed. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.